170 F.3d 1223
 29 Envtl. L. Rep. 21,024, 99 Cal. Daily Op.
Serv. 2126,
1999 Daily Journal D.A.R. 2758
 HOONAH INDIAN ASSOCIATION, Plaintiff-Appellant,
v.
Gary MORRISON, Forest Supervisor, Chatham Area, Tongass
National Forest; Phil Janik, Regional Forester,
Alaska Region, United States Forest
Service; U.S. Forest Service,
Defendants-Appellees.
Sitka Tribe of Alaska, Plaintiff-Appellant,
v.
Gary Morrison, Forest Supervisor, Chatham Area, Tongass
National Forest; Phil Janik, Regional Forester,
Alaska Region, United States Forest
Service; U.S. Forest Service,
Defendants-Appellees.
 Nos. 97-35833, 97-36018.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 4, 1998.
Decided March 24, 1999.
 
 Thomas S. Waldo, Earthjustice Legal Defense Fund, Juneau, Alaska, for plaintiff-appellant Hoonah Indian Association; Michael Jude Pate, Sitka Tribe of Alaska, Sitka, Alaska, for plaintiff-appellant Sitka Tribe of Alaska.
 David C. Shilton, United States Department of Justice, Washington, D.C., for defendants-appellees.
 Vance A. Sanders, Council and Sanders, Juneau, Alaska, for amici curiae Klawock Cooperative Association and Organized Village of Kake.
 Appeals from the United States District Court for the District of Alaska; John W. Sedwick, District Judge, Presiding. D.C. Nos. CV-96-00018-JWS, CV-96-00019-JWS.
 Before: BRUNETTI, RYMER, and KLEINFELD, Circuit Judges.
 KLEINFELD, Circuit Judge.
 
 
 1
 These appeals relate to two timber sales, and raise questions under the Alaska National Interest Lands Conservation Act (ANILCA), and the National Historic Preservation Act (NHPA).
 
 
 2
 Facts.
 
 
 3
 The Forest Service gave notice of its intent to conduct timber sales in the Tongass National Forest in Southeast Alaska. 58 Fed.Reg. 21559-01, 37458-01 (1993). Two sales were proposed, called the Northwest Baranof and Eight Fathom, on Baranof Island north of Sitka, and on Chichagof Island around Hoonah.
 
 
 4
 The timber sales were planned pursuant to the Tongass Timber Reform Act, 16 U.S.C. § 539d. This federal law speaks not to all national forests but only to one, the Tongass National Forest in Southeast Alaska. It commands the Secretary of Agriculture to sell enough wood from the Tongass National Forest, subject to certain qualifications, to satisfy market demand:
 
 
 5
 a. Tongass National Forest timber supply; satisfaction of certain market demands. Subject to appropriations, other applicable law, and the requirements of the National Forest Management Act of 1976 (Public Law 94-588), except as provided in subsection (d) of this section, the Secretary shall, to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources, seek to provide a supply of timber from the Tongass National Forest which (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle.
 
 
 6
 16 U.S.C. § 539d(a).
 
 
 7
 Final Environmental Impact Statements were published in February, 1996 for the Northwest Baranof project, and in May, 1996 for the Eight Fathom project.
 
 
 8
 Hoonah Indian Association and Sitka Tribe brought this lawsuit and now appeal. Hoonah is among Alaska's larger villages, about 800 people, and Sitka is among its largest cities (by Alaska standards), close to 9,000 people. The Native community in each town has a tribal government. Both towns are in Southeast Alaska. Though the towns are distinct from the tribal governments (Sitka is largely non-Native, with a substantial Tlingit minority), the tribal governments are referred to herein for convenience as Hoonah and Sitka. Sitka and Hoonah both argue that the timber sales would violate 16 U.S.C. § 3120's limitation on dispositions affecting subsistence uses of public land. Sitka also argues that the Northwest Baranof sales would violate the National Historic Preservation Act, 16 U.S.C. § 470f.
 
 
 9
 The tribal governments moved for summary judgment, which was denied. They sought injunctions, which were denied as well. The United States moved for clarification, noting that the Tribes had moved for a permanent, not preliminary, injunction. The district court granted the clarification, stating that its order denying an injunction was a final decision. The Tribes appeal. Because there was no certification under Federal Rule of Civil Procedure 54(b), we lack jurisdiction to review the denial of summary judgment. See Datagate, Inc. v. Hewlett-Packard, 941 F.2d 864, 868 n. 1 (9th Cir.1991); Kraus v. County of Pierce, 793 F.2d 1105, 1106 (9th Cir.1986). We have jurisdiction to review denial of the injunction under 28 U.S.C. § 1292(a)(1).
 
 
 10
 Analysis.
 
 
 11
 I. Alaska National Interest Lands Conservation Act Claims.
 
 
 12
 The ANILCA claim relates to what the statute calls "subsistence." The Tribes say in their brief that "[i]n the lower 48 states, 'subsistence' is often associated with the grinding poverty present on many Indian reservations.... In Alaska ... 'subsistence' represents a source of great economic and cultural wealth." What the subsistence issue is about in this case, concretely, is deer hunting. The evidence was that in Hoonah, the value of fish and game, especially deer, provide around a third of average household income. Basically people who successfully hunt enough deer need not buy much meat for cash. The subsistence issue is cultural as well as economic. By living on deer meat that they hunt, Tlingits provide for their subsistence as their ancestors did.
 
 
 13
 Rural Alaskan subsistence is protected by a provision in the Alaska National Interest Lands Conservation Act (ANILCA). Though directed in large part toward land conservation rather than subsistence, ANILCA says in part that no permit or other use of public lands "which would significantly restrict subsistence uses shall be effected until" the agency head determines that such a restriction is "necessary, consistent with sound management principles for the utilization of public lands" and would "involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition."[1] 16 U.S.C. § 3120(a).
 
 
 14
 A. "Necessary."
 
 
 15
 Hoonah and Sitka argue that, although the agency head purported to make the determinations ANILCA requires, he misinterpreted the statutory command and should have determined that the timber sales were neither "necessary" nor involved the "minimal" amount of lands necessary. The statute does not require the "necessary" finding except where a disposition "would significantly restrict subsistence uses." 16 U.S.C. § 3120(a). The agency head found that these timber sales would not by themselves significantly affect subsistence uses, but would in combination with other timber sales, by the Forest Service and Native corporations, in the past, contemporaneously, and in the future.
 
 
 16
 For the last two decades, both the Forest Service and the local Native corporations have sold rights to clear cut various areas around Hoonah and Sitka. This damages deer habitat. The deer are likely to leave areas with trees cut down and noisy with chain saws, and go to undisturbed woods. But there are a lot of deer in the area, even though timber harvesting has been extensive since the Russians colonized the area two centuries ago (they colonized it partly because it had extensive timber good for shipbuilding). The Tlingits have subsisted on deer hunting there, as well as fishing and trading, since time immemorial. The final environmental impact statements conclude that the impact of the timber sales at issue on the deer population would be "minimal." The environmental impact statements conclude that the total deer habitat capabilities of the Northwest Baranof and Eight Fathom locations would decrease two and seven percent, respectively.
 
 
 17
 We assume, as the parties have, but do not decide, that a sale which would not by itself significantly restrict subsistence uses, but which would in combination with other sales public and private, meets the statutory condition, "which would significantly restrict subsistence uses."[2]
 
 
 18
 The Tribes' argument about "necessary" is that the Secretary was not required by statute to sell any particular minimum amount of timber, just to "seek to provide a supply" meeting market demand. Because the Secretary is not compelled by law to provide a minimum amount, any significant restriction on subsistence use is not "necessary." They correctly cite Alaska Wilderness Recreation and Tourism Ass'n. v. Morrison, 67 F.3d 723, 731 (9th Cir.1995), for the proposition that 16 U.S.C. § 539d(a) "envisions not an inflexible harvest level, but a balancing...." The Tribes' argument would imply that, because there is no law requiring a set amount of timber harvesting, no restriction on subsistence uses is "necessary," so any use significantly restricting subsistence uses would be prohibited.
 
 
 19
 We agree with the United States' argument that the word "necessary" does not have the effect of prohibiting timber sales that affect subsistence and are not required by law. The statute does not say that. The word "necessary" does not stand outside of a context, subject to definition only by a dictionary. The subsistence provision of the statute says "necessary, consistent with sound management principles for the utilization of public lands." The words following the comma qualify and explain the statutory term "necessary." The agency head is directed by Congress to consider consistency with "sound management principles for the utilization of the public lands" in connection with evaluating whether a significant restriction of subsistence uses is "necessary." A significant restriction of subsistence uses might not be necessary to achieve compliance with law, yet necessary to conform to sound management principles for such "utilization." If so, the statutory language would make it "necessary."
 
 
 20
 The Forest Supervisor found that "these actions are necessary, consistent with sound management of public lands." His Record of Decision for the Northwest Baranof sale says that "a substantial component of the economy of Southeast Alaska is dependent on a viable timber industry," and "there is a clear need" for the sale in order to "come closer to the objective of providing a three-year supply of timber to the existing dependent industry." The Record of Decision for the Eight Fathom Sale is similar. The record establishes that these findings are not arbitrary and capricious. See Natural Resources Defense Council v. United States Dep't of Interior, 113 F.3d 1121, 1123-24 (9th Cir.1997).
 
 
 21
 The Tribes argue that because the Tongass Timber Reform Act is "subject to ... other applicable law," 16 U.S.C. § 539d(a), the subsistence provision in 16 U.S.C. § 3120(a) controls. The argument is correct to the extent that the Tongass Timber Reform Act does not supersede the cited ANILCA provision. But the ANILCA subsistence provision also does not supersede the Tongass Timber Reform Act. The statutes do not conflict. Both apply. The subsistence provision of ANILCA says "necessary, consistent with sound management principles for the utilization of public lands." The "utilization" to which "sound management principles" refers is multiple, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness":
 
 
 22
 § 1604. National Forest System land and resource management plans
 
 
 23
 (e) Required assurances
 
 
 24
 In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans -
 
 
 25
 (1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960, and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness....
 
 
 26
 The Supreme Court has instructed us emphatically, in an earlier reversal, that "Congress clearly did not" subordinate all other uses to subsistence uses:
 
 
 27
 Congress clearly did not state in ANILCA that subsistence uses are always more important in development of energy resources, or other uses of federal lands; rather, it expressly declared that preservation of subsistence resources is a public interest and established a framework for reconciliation, where possible, of competing public interests.
 
 
 28
 Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545-46, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (emphasis in original).
 
 
 29
 The Tribes argue that we must construe the word "necessary" in light of the canon that ambiguous provisions in Indian legislation are construed " 'in favor of the Indians.' " Bryan v. Itasca County, 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (quoting Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918)). But they are mistaken in arguing that the "subsistence uses" provision is Indian legislation in the sense to which the doctrine refers. The doctrine is that "statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Bryan, 426 U.S. at 392, 96 S.Ct. 2102. Thus it has been held that a tax exemption statute, which would ordinarily be strictly construed in favor of the government, must be construed in favor of a dependent Indian tribe in a statute passed for its benefit, by analogy to the long established principle that ambiguities used in treaties with the Indians should not be construed against the tribes. Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912).
 
 
 30
 The Tribes argue that ANILCA is Indian legislation entitled to the benefit of the doctrine, based on a remark Representative Udall, one of the sponsors, made in Congress in 1979. He said that the doctrine applied because the statute "was developed primarily for the benefit of Alaska Native residents of Alaska's rural villages who are dependent on subsistence uses." 125 Cong. Rec. 9904 (1979). Use of this sort of quotation puts us in mind of the remark that courts use legislative history "as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." Conroy v. Aniskoff, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring, paraphrasing Judge Harold Leventhal). The remarks of an individual legislator on the floor are not part of the statute passed by both houses and signed by the President, so they lack the force of law. Nor would those seeking to attribute a contrary purpose find no friends at the cocktail party. The report of the Senate Energy and Natural Resources Committee is at pains, every time it mentions rural subsistence, to make it clear that it is not speaking only of what Natives do, and is not speaking of what people in Alaska's five largest cities do regardless of whether they are Native; it says the provision is for "Native and non-Native residents of 'rural' Alaska." S. Rep. 96-413 at 5177 (1979), U.S. Code Cong. & Admin. News 1980 at 5070. We noted in Kenaitze Indian Tribe v. State of Alaska, 860 F.2d 312, 313 n. 1 (9th Cir.1988), that earlier drafts of the statute "protected only subsistence uses by Native Alaskans," but "Congress broadened the preference to include all 'rural residents' " to avoid state constitutional concerns. The fact that such good "legislative history" is available for both sides of the argument illustrates how easily it may be created by advocates of one position or the other during the legislative process who did not get their views into the statutory language, and also why it is so frequently a waste of time to use it to construe the statute. Better guidance is available from the words of the law duly passed and signed.
 
 
 31
 The language that made it into the statute expressly states that it is for the benefit of rural subsistence users, regardless of whether they are members of tribes.[3] Congress expressly rejected the proposition that the subsistence provision was only for Natives. The statute says that its purpose is to protect "subsistence uses by rural residents of Alaska, including both Natives and non-Natives." 16 U.S.C. § 3111(1) (emphasis added). There could not be a plainer declaration that Congress was not passing Indian legislation. While many of those rural Alaskans who support themselves and their families largely by fishing, hunting and trapping are Native, quite a few are not. And many of the Native Alaskans who feed their families in significant part by hunting and fishing live in the larger towns and cities, not in the rural areas, so they do not get the benefit of the "rural residents" preference. That the legislation may benefit Natives more than others does not make it Indian legislation, any more than legislation affecting snowmobiles and river boats is Indian legislation because of the greater importance of snowmachines and boats than automobiles in the many villages unconnected with the highway system. Disparate impact on Natives does not make legislation "Indian legislation" for purposes of the doctrine that "statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Bryan, 426 U.S at 392, 96 S.Ct. 2102 (quoting Alaska Pacific Fisheries, 248 U.S. at 89, 39 S.Ct. 40).
 
 
 32
 B. "Minimal lands."
 
 
 33
 In addition to requiring a determination that a disposition significantly affecting subsistence uses is "necessary, consistent with sound management principles," ANILCA requires a determination that the use will involve "the minimal amount of public lands necessary:"
 
 
 34
 (3) determines that ... (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition....
 
 
 35
 16 U.S.C. § 3120(a)(3)(B). The Forest Supervisor determined that "[t]he amount of public land involved to implement the Selected Alternative is (considering sound multiple-use management of public lands) the minimum necessary." The land had been harvested for trees many times in the two centuries since the Russians colonized it, and other alternatives would not substantially lessen risk to deer hunting. A more concentrated harvest would harm distribution of deer available for subsistence. But the Forest Supervisor conceded that there was another alternative that would harvest trees from fewer acres.
 
 
 36
 The Tribes concede in their brief that "subsection (b) should not be read strictly to require the lowest number of acres of public lands in all cases." In the Baranof sale, the fewest acres were involved in alternative 1, but the Forest Service designed a sale closest to alternative 2. The Tribes argue for alternative 3, not alternative 1, even though alternative 1 would affect fewer acres. Alternative 2 concentrated logging where there had been previous logging, and would use reconstructed roads. Alternative 3, preferred by the Tribes, would defer timber harvest in the areas closest to Sitka, leaving more deer closer to town.
 
 
 37
 The reason the Forest Supervisor determined that the selected alternative involved the minimal land necessary was that (1) it was most consistent with sound multiple use management, (2) it had been harvested many times since the Russians colonized the area more than two centuries before, (3) the other alternatives would not substantially reduce risk to subsistence use, and (4) harvest could not be reduced in one area and concentrated in another without harming some other rural community's subsistence use. Similar determinations were made for the Eight Fathom Sale. In addition, the Forest Supervisor noted that "[t]he Selected Alternative provides a balance of job and economic opportunities, timber volume, and increased timber productivity with consideration for resource concerns."
 
 
 38
 The Tribes argue for a subsistence-based construction of the statutory phrase "the minimal amount of public lands necessary." They argue that the agency head must, under 16 U.S.C. § 3120(a), "select the alternative which minimizes, not necessarily the total acres of public lands, but the amount of land needed for subsistence purposes."The language of the statute does not permit the construction urged by the Tribes. The statute says "minimal amount of public lands necessary to accomplish the purposes of such use, occupancy or other disposition." The measure of what is "necessary" and what must be "minimal" in the statutory language is "the purposes of such ... disposition," not minimization of impact on subsistence. The purpose of the disposition was to sell timber. That was consistent with what Congress required in the Tongass Timber Reform Act, and what the Forest Service management plan provided for. The Forest Supervisor's decision necessarily considered quite a few effects of the timber sale: (1) fish habitat and water quality; (2) wildlife habitat and populations; (3) old growth; (4) marine environment; (5) subsistence; (6) recreation; (7) scenic quality; (8) economic and social quality; and (9) heritage resources. He made "Findings Required by Law" on: (1) National Forest Management Act; (2) Tongass Land Management Plan; (3) Alaska Regional Guide; (4) Clearcutting as the Optimal Method of Harvesting; (5) Clearcuts Over 100 Acres in Size; (6) Tongass Timber Reform Act; (7) Endangered Species Act; (8) Bald Eagle Protection Act; (9) Clean Water Act; (10) National Historic Preservation Act; (11) Federal Cave Resource Protection Act of 1988; (12) ANILCA Section 810 [16 U.S.C. § 3120] Subsistence Evaluation and Findings; (13) Executive Orders 11988 and 11990; (14) Coastal Zone Management Act; and (15) Federal and State Permits. He not only had to consider rural residents' subsistence interests, but even such matters as the "high risk of dwarf mistletoe reinfection" of hemlock if a method other than clearcutting was used for timber harvesting. Subsistence uses by rural Alaskans are an important public interest to which the Forest Supervisor had to give careful attention. But they are not the only such interest.
 
 
 39
 II. National Historic Preservation Act.
 
 
 40
 This issue affects only the Northwest Baranof sale on Baranof Island outside of Sitka, not the Eight Fathom sale on Chichagof Island near Hoonah. From the time the Russians colonized what they called New Archangel, now Sitka, their relations with the Tlingits native to the area were hostile. American and British traders contributed to the hostility by trading with the Tlingits on better terms than the Russians, and supplying guns. In 1802, the Tlingits defeated the Russians and the Aleuts they forced to serve them, and took over the settlement. It took quite a while for the Russians to build up enough strength to try to take it back, but in 1804, Baranof assembled an entire fleet, and after a battle that lasted seven days, reconquered the fort. The Tlingits retreated north. In addition to the historical materials in the record, this saga is discussed in P.A. Tikhmenev, A History of the Russian-American Company 65-75 (1861-63, Richard A. Pierce and Alton S. Donnelly trans.1978), and James R. Gibson, Imperial Russia In Frontier America 9-14 (1976).
 
 
 41
 The National Historic Preservation Act issue has to do with whether the route or routes one clan of the Tlingits, the Kiks.adi, took should have been designated a cultural site and the timber sale should have been enjoined while the process for listing it proceeded. The Tlingit fort is a historic site in present-day Sitka, but the route or routes of the march were not designated.
 
 
 42
 The applicable procedure under the Act, 16 U.S.C. §§ 470 et seq., is for State Historic Preservation Officers to identify and nominate properties for the National Register. 16 U.S.C. 470a(b)(3). The Act requires agencies, prior to undertaking projects on federal land, to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. That language is carried over from the definitions section of the statute, defining "historic property" and "historic resource" as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion on the National Register...." 16 U.S.C. § 470w(5).
 
 
 43
 In preparing the Environmental Impact Statement for the Northwest Baranof timber sales, Forest Service archaeologists identified 45 historic properties, and determined that 39 were eligible for inclusion in the National Register. The State Historic Preservation Office, charged with administering the NHPA, agreed with the Forest Service's findings. The Forest Service, with the Tribe's agreement, decided the 39 designated sites would not be affected by the timber sale. The route of the retreat after the Russian reconquest, called in the record the Kiks.adi Survival March, was not among the sites listed as eligible. The Sitka Tribe contends that the Forest Service's procedure regarding identification of the "Kiks.adi Survival March" violated the National Historic Preservation Act.
 
 
 44
 The Forest Service early in the process decided that the route of the survival march might be eligible for inclusion because of its cultural importance. The reason that it was ultimately not designated as a cultural site is that the Forest Service was unable to determine just where the Kiks.adi Survival March went. The Tribe argues that this was an arbitrary and capricious failure to designate, because oral history suggested multiple routes, at least one for the strong men and another for the women, children, and old people, and because it was arbitrary to require a site with observable physical identification.
 
 
 45
 The regulations say that if the relevant agency official and state historic preservation officer "agree that the criteria are not met, the property shall be considered not eligible." 36 C.F.R. § 800.4(c)(3). The Alaska State Historic Preservation Officer determined that the Survival March Trail was not eligible because it did not meet established criteria that "it have identified physical features" and that it be "a location where the people regularly returned to." Her determination was based upon review of the materials submitted to her by a panel of experts. The Tribe did not appeal the State Historic Preservation Officer's decision. It could have under 36 C.F.R. § 60.12. Failure to do so makes that decision unchallengeable for failure to exhaust administrative remedies, under 36 C.F.R. § 60.12(e).
 
 
 46
 The Tribe did challenge the Forest Service's environmental impact statement on the ground that the Forest Service did not recommend listing the Kiks.adi Survival March trail. Our review of that decision is limited to whether it was arbitrary or capricious. See Natural Resources Defense Council v. United States Dep't of Interior, 113 F.3d 1121, 1123-24 (9th Cir.1997).
 
 
 47
 The statute defines "historic property" and "historic resource" as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion on the National Register...." 16 U.S.C. § 470w(5). The words "district, site, building, structure or object" all connote something more concretely bounded and defined than a general area over which a group of people passed.
 
 
 48
 The Tribe notes that 36 C.F.R. § 800.4(c)(1) requires agencies to "apply the National Register Criteria to properties that may be affected by the undertaking and have not been previously evaluated for National Register eligibility," and argues that the Forest Service never applied the National Register Criteria to the Survival March routes. But the record shows that it did. The Forest Service made extensive efforts for close to three years to identify the Kiks.adi Survival March routes, by consulting with experts and considering tribal traditions and individuals' recollections of what relatives had told them. There was no physical marking, no documentation, and no well established tribal consensus, to establish exactly what bear and deer trails, beaches, and other paths the retreating Kiks.adi had taken.
 
 
 49
 The regulations require the agency official to "[s]eek information in accordance with agency planning processes from ... Indian tribes." 36 C.F.R. 800.4(a)(iii). He did. The tribe could not tell him just where the retreating Kiks.adi passed.
 
 
 50
 The Forest Service followed the regulations and used the National Register criteria, as the Tribe says it should have. Those criteria do not support the Tribe's position. The National Register Bulletin entitled "How To Apply the National Register Criteria for Evaluation" says in the explanation of "site" that "when the location of a prehistoric or historic event cannot be conclusively determined because no other cultural materials were present or survive, documentation must be carefully evaluated to determine whether the traditionally recognized or identified site is accurate." National Register Bulletin 15, p. 5. There was no original source documentation, and all the materials available were carefully evaluated, and did not confirm the accuracy of any suggested path. The criteria say that "[t]he actual location of a historic property, complemented by its setting, is particularly important in recapturing the sense of historic events and persons." Id. at 44. The "actual location" of the Kiks.adi route is unknown, and the Tribe's own submission called it a "symbolic" location as opposed to an "actual" one.
 
 
 51
 The Tribe places great emphasis on research by a Mr. Hope, a tribal member who had not grown up knowing where the march went, but after research, thought he had a good conclusion, supported by what his grandfather had told him and what he thought would be feasible, about the route. Mr. Hope appears to have coined the term, "Kiks.adi Survival March." The ages of the individuals are not in the record. But even if Mr. Hope's grandfather were 100 years old in 1987 when Mr. Hope became interested, and could remember geographical details back to when he was 10, that would go back only 90 years, to 1897, which would be 93 years after the Kiks.adi retreat. Other tribal members disagreed with Mr. Hope's theory, though eventually the Tribe decided to adopt it as its position.
 
 
 52
 Importantly, the Tribe's application says that the large number of people "would have necessitated being several routes taken so as to have enough food to eat along the way." That makes perfect sense. It would be hard to kill enough deer or catch enough fish for 1,000 people unless they spread out. But if they did, there would not be any particular path, just a general direction through a large wilderness.
 
 
 53
 That important things happened in a general area is not enough to make the area a "site." There has to be some good evidence of just where the site is and what its boundaries are, for it to qualify for federal designation as a historical site. The Historian of the National Register of Historic Places wrote, in opposition to listing the Kiks.adi route, that his staff consistently rejected "nominating such a wide swath of land with little if any identified physical features." The Historian noted that when trails had been designated, such as the Lewis and Clark Trail, only those particular rock formations, ruts, and other identified physical features where the trail was "confined to a very narrow corridor" were listed. That a general unbounded and imprecisely located area has important cultural significance is not enough. Abraham's tomb is an identifiable site, but the wanderings of the Jews in the Sinai Desert after the Exodus did not leave any accurately identifiable path that could be a "site."
 
 
 54
 The Forest Service did not act arbitrarily and capriciously, on this record, in concluding that it could not identify a "site" as the Kiks.adi Survival March.
 
 
 55
 Conclusion.
 
 
 56
 The district judge correctly determined that because the Tribe could not prevail on the merits, and the Forest Service determinations were not arbitrary or capricious, the Tribe's prayer for an injunction against the timber sales should be denied. The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 § 3120. Subsistence and land use decisions
 (a) Factors considered; requirements. In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes. No such withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses shall be effected until the head of such Federal agency -
 (1) gives notice to the appropriate State agency and the appropriate local committees and regional councils established pursuant to section 805 [16 U.S.C.S. § 3115];
 (2) gives notice of, and holds, a hearing in the vicinity of the area involved; and
 (3) determines that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.
 (d) Management or disposal of lands. After compliance with the procedural requirements of this section and other applicable law, the head of the appropriate Federal agency may manage or dispose of public lands under his primary jurisdiction for any of those uses or purposes authorized by this Act or other law.
 
 
 [2]
 The word "which" in the statute might be read to refer to "such," so that the condition, "which would significantly restrict subsistence uses" might be limited to "such" disposition, as opposed to that disposition in combination with others, private and public, past, present and future. We do not intimate that a timber sale that does not by itself significantly affect subsistence uses should be treated as though it does, if, for example, a Native corporation sale is planned on land adjacent to it, and in combination the two sales would adversely affect subsistence uses. We leave that question for a case in which it is raised
 
 
 [3]
 In Amoco Production Co. v. Gambell, 480 U.S. 531, 555, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), the Supreme Court rejected our application of the rule of statutory construction for Indian legislation to another part of ANILCA: "we reject the Ninth Circuit's reliance on the familiar rule of statutory construction that doubtful expressions must be resolved in favor of Indians. People of Village of Gambell v. Clark, 746 F.2d 572, 581 (9th Cir.1984). There is no ambiguity here which requires interpretation." The Court held that the rule of statutory construction did not permit disregard of clearly expressed Congressional intent. Id. That is the case here