DEPARTMENT OF TOXIC SUBSTANCES CONTROL, Plaintiff,

v.

INTERSTATE NON–FERROUS CORPORATION, et al.; Barstow Truck Parts and Equipment Co., Inc.; Steinmeyer Corporation dba Silver Steel & Metal Company; Alpert & Alpert Iron & Metals, Inc.; G. Harris International, Inc.; San Fernando Motors; Socal Metals, Inc.; Augustine Metals, Inc.; Herman Berkovics; Metal Doctors, Inc. dba Harley Metals Co.; United States of America; and the Estate of William C. Huffman, deceased; Defendants.

And Related Cross–Actions

No. CV–F–97–5016 OWW LJO.

United States District Court, E.D. California.

May 25, 2000.

MEMORANDUM DECISION AND OR-
DER RE PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDG-
MENT REGARDING APPLICA-
TION OF CERCLA SECTION 127

WANGER, District Judge.

## I.  INTRODUCTION

Plaintiff, the State of California Depart-
ment of Toxic Substances Control
("DTSC"), brings this motion for partial

summary judgment that newly enacted
CERCLA Section 127, the Superfund Re-
cycling Equity Act ("the Act"), a rider to
H.R. 3194, the 2000 Consolidated Appro-
priation Act, signed into law by the Presi-
dent November 29, 1999, see Pub.L. No.
106–113, 113 Stat. 1501A–598 (1999), does
not apply to this pending action.  The
issue of the Act's application to pending
cost-recovery actions for past transactions
has not been decided in this Circuit.
Three oppositions were filed on behalf of
Defendants and Third Parties;  the three
lead defendants are:  Augustine Metals,
Inc., Certain Original Sellers ("Sellers"),
and the Steinmeyer Corporation.  The In-
stitute of Scrap Recycling Industries, Inc.
("Amicus") filed an opposition as amicus
curiae.

## II.  LEGAL STANDARD

Summary judgment is appropriate only
"if the pleadings, depositions, answers to
interrogatories, and admissions on file, to-
gether with the affidavits, if any, show that
there is no genuine issue as to any materi-
al fact."  FED. R. CIV. P. 56(c);  see Maffei
v. Northern Ins. Co. of New York, 12 F.3d
892, 899 (9th Cir.1993). A genuine issue of
fact exists when the nonmoving party pro-
duces evidence on which a reasonable trier
of fact could find in its favor viewing the
record as a whole in light of the evidentia-
ry burden the law places on that party.
See Triton Energy Corp. v. Square D Co.,
68 F.3d 1216, 1221 (9th Cir.1995);  see also
Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 252–56, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986).

Plaintiffs move for "partial summary
judgment regarding application of Section
127."  Such a request is more appropriate-
ly brought as a motion for summary adju-
dication:

If on motion under this rule judgment is
not rendered upon the whole case or for
all the relief asked and a trial is neces-
sary, the court ... shall if practicable
ascertain what material facts exist with-
out substantial controversy and what

material facts are actually and in good faith controverted.

Fed. R. Civ. P. 56(d). An order under Rule 56(d) narrows the issues and enables the parties to recognize more fully their rights, yet it permits the court to retain full power to completely adjudicate all aspects of the case when the proper time arrives. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice And Procedure § 2737, at 455–56 (2d ed.1983).

The procedure under Rule 56(d) is designed to be ancillary to a summary judgment motion. Unlike Rule 56(c), which allows for interlocutory judgment on a question of liability, Rule 56(d) does not authorize the entry of a judgment on part of a claim or the granting of partial relief. *Id.,* § 2737, at 457.

■ The obligation imposed on the court by Rule 56(d) to specify the uncontroverted material facts is technically compulsory. *See Woods v. Mertes,* 9 F.R.D. 318, 320 (D.Del.1949). However, if the court determines that identifying indisputable facts through partial summary judgment would not materially expedite the adjudicative process, it may decline to do so. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra,* § 2737, at 460. Here, the inquiry does not depend on facts. The facts attending the enactment of Section 127 are not disputed.

The interpretation of legislation generally presents an issue of law appropriate for resolution by the Court as a matter of law. *See City of St. Louis v. Department of Transportation,* 936 F.2d 1528, 1535 (8th Cir.1991) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 864–66, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *United States v. Carr,* 66 F.3d 981, 983 (8th Cir.1995); *United States v. Moore,* 38 F.3d 977, 979 (8th Cir.1994); *Prudential Ins. Co. v. Rand & Reed Powers Partnership,* 972 F.Supp. 1194, 1202 (N.D.Iowa 1997) (citing *Carr* and *Moore* for the principle: "[S]tatutory interpretation-particularly interpretation of the effect of a statute where facts

are undisputed-is primarily a legal question amenable to summary judgment."). A motion that presents only a question of law is appropriately resolved on summary adjudication. *See Hulmes v. Honda Motor Co., Ltd.,* 924 F.Supp. 673, 678 (D.N.J. 1996).

## III. *PROCEDURAL HISTORY*

On January 13, 1997, DTSC filed this suit for cost recovery and declaratory relief under CERCLA sections 107(a) and 113(g) for response, removal and remedial costs resulting from a release or threat of release of hazardous substances, and for injunctive relief to abate conditions at or around the site at Mojave, California, known as the "Mobile Smelting Property." Of the eleven Defendants, ten are scrap metal dealers who brought scrap metal to the Mobile Smelting Site to have it burned or smelted in order to recover the metal. Two of the ten have settled with Plaintiff. The eleventh, the United States is alleged to have sold the scrap materials to the scrap metal dealers.

Two years after the suit was filed, Congress passed the Act. *See* Pub.L. No. 106–113, 113 Stat. 1501A–598 (1999). Section 127, "SUPERFUND RECYCLING EQUITY," is found in Title VI:

(a) PURPOSES.—The purposes of this section are -

(1) to promote the reuse and recycling of scrap material in furtherance of the goals of waste minimization and natural resource conservation while protecting human health and the environment;

(2) to create greater equity in the statutory treatment of recycled versus virgin materials; and

(3) to remove the disincentives and impediments to recycling created as an unintended consequence of the 1980 Superfund liability provisions.

§ 6001(a). To achieve these ends, Section 127 clarifies liability:

(b) CLARIFICATION OF LIABILITY UNDER CERCLA FOR RECYCLING TRANSACTIONS. -

(1) CLARIFICATION.—Title I of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) Is amended by adding at the end the following new section:

"SEC. 127 RECYCLING TRANSAC-TIONS."

"(a) LIABILITY CLARIFICA-TION. -"

"(1) As provided in subsections (b), (c), (d), and (e), a person who arranged for recycling of recyclable material *shall not be liable* under sections 107(a)(3) or section 107(a)(4) with respect to such material."

1501A–598–99 (emphasis added). The effect of Section 127 is to exempt from arranger liability and transporter liability under CERCLA §§ 107(a)(3) and (a)(4), set forth below, recyclers who arrange for or transport recyclable material.

In general, CERCLA liability attaches when a defendant is within one of the four classes of parties subject to CERCLA's liability provisions. *See Long Beach Unified School Dist. v. Dorothy B. Godwin California Living Trust*, 32 F.3d 1364, 1367 (9th Cir.1994).[1] One such "class" is an "arranger;" who:

by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). A second class is, a "transporter;" who:

accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a)(4).[2] The reason the four "classes" are listed is so that liability "reach[es] back through the causal chain from those who ultimately dispose of a hazardous substance to those who transport and generate it." *Pneumo Abex Corp. v. High Point, Thomasville and Denton Railroad Co.*, 142 F.3d 769, 774 (4th Cir.1998).

Section 127(a)(1) exempts recyclers of "recyclable materials." "Recyclable material" is defined as:

scrap paper, scrap plastic, scrap glass, scrap textiles, scrap rubber (other than whole tires), scrap metal, or spent lead-acid, spent nickel-cadmium, and other spent batteries, as well as minor amounts of material incident to or adhering to the scrap material as a result of its normal and customary use prior to becoming scrap.

*See id.* at § 127(b). Whether a transaction is "arranged for recycling" depends on the type of recyclable material: 1) scrap paper, plastic, glass, textiles, or rubber, *see id.* at § 127(c); 2) scrap metal, *see id.* at § 127(d); or 3) batteries, *see id.* at § 127(e). The burden is on the person who arranged for a transaction, by selling recyclable material or by otherwise arranging for the recycling of recyclable material, to demonstrate by a preponderance of the evidence that the statutory criteria are met. *See id.* §§ 127(c)–(e).

1. In addition, the following four elements must be satisfied: "(1) the waste disposal site is a 'facility' ...; (2) a 'release' or 'threatened release' of any 'hazardous substance' from the facility has occurred ...; and (3) such 're-

lease' or 'threatened release' has caused the plaintiff to incur response costs," *id.* 1366–67.

2. The other two classes are defined by §§ 9607(a)(1) & (a)(2).

Title VI expressly addresses the temporal reach of Section 127:

> EFFECT ON PENDING OR CONCLUDED ACTIONS.-The exemptions provided in this section shall not affect any concluded judicial or administrative action or any pending judicial action initiated by the United States prior to enactment of this section.

*Id.* § 127(i) at 113 Stat. 1501A–602. This provision does not expressly address pending judicial actions filed by parties other than the United States.

Technically speaking, the DTSC is an entity "within" the California Environmental Protection Agency. *See* CAL. HEALTH & SAFETY CODE § 58000. The California Environmental Protection Agency is a state agency. *See* CAL. GOVT. CODE § 12800. Although termed a "Department," DTSC has been characterized by the California Supreme Court as a state agency. *See Foster–Gardner Inc. v. National Union Fire Ins. Co.,* 18 Cal.4th 857, 889, 77 Cal. Rptr.2d 107, 959 P.2d 265 (Cal.1998). Here, a state agency seeks cost-recovery for past and future transactions in a pending judicial action.

On January 28, 2000, Plaintiff sought partial summary judgment for an interpretation that Section 127's relief from liability provisions do not apply to this pending judicial action. All oppositions seek a statutory interpretation that Section 127 applies to all past, present, and future transactions.

## IV. *WHEN CAN A STATUTE BE APPLIED TO PENDING CASES?*

### A. *RETROSPECTIVE v. RETROACTIVE*

■ To answer the question whether a statute can be applied to pending cases, the Supreme Court set forth an analytical construct in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). *See Resolution Trust Corp. v. Bayside Developers,* 43 F.3d 1230, 1235 (9th Cir.1994). This analysis discusses statutes in terms of whether they are retroactive. *See Landgraf,* 511 U.S. at ——. "Retroactivity is generally disfavored in the law, in accordance with 'fundamental notions of justice' that have been recognized throughout history." *Eastern Enterprises v. Apfel,* 524 U.S. 498, 532, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (citations omitted). *Landgraf* prescribes a two-part test: 1) has Congress expressly prescribed the temporal reach of the statute?; and, if not, 2) does the statute have retroactive effect?

The Ninth Circuit has refined its analysis of the term "retroactive," *in United States v. $814,254.76,* 51 F.3d 207, 210 & n. 3 (9th Cir.1995); as explained by the dissent in *Jeffries v. Wood,* 114 F.3d 1484 (9th Cir.1997) (en banc): "[c]ontrary to popular misconception, not all laws that apply to pending cases are 'retroactive,'" *Id.* at 1502. If a statute applies to pending cases, it is termed "retrospective." *See $814,254.76,* 51 F.3d at 210 n. 3.

"[A] retrospective statute is retroactive if it attaches new legal consequences to prior acts so as to justify the presumption against retrospective application." *Id.* at 210 n. 3. This suggests the first *Landgraf* inquiry determines if a statute is retrospective, and the second inquiry examines if it is retroactive. "*Landgraf* teaches that courts should not apply 'retroactive' statutes 'retrospectively' absent clear congressional intent." *United States ex rel Lindenthal v. General Dynamics Corp.,* 61 F.3d 1402, 1407 (9th Cir.1995). "Laws that have no 'retroactive effect' when applied to pending cases are deemed, in our circuit, 'retrospective' laws." *Jeffries,* 114 F.3d at 1502 (in dissent) (citing *Lindenthal,* 61 F.3d at 1408).

Following the retrospective distinction, district courts have adopted varying analyses. *See Mannatt v. United States,* 951 F.Supp. 172, 176 (E.D.Cal.1996) ("[T]o determine whether [a statutory amendment] applies retrospectively, the court must con-

sider whether the statute would have a 'retroactive effect' if applied retrospectively."); *Sousa v. Chater,* 945 F.Supp. 1312, 1328 (E.D.Cal.1996) ("[O]ne clear principle stands out: If Congress has indicated that a statute is to have effect in cases pending at the time of the statute's enactment, the analysis ends, except in situations where retroactive effect of the statute would work unfairness of constitutional magnitude."); *Madrid v. Gomez,* 940 F.Supp. 247, 249 (N.D.Cal.1996) ("[C]ourts must first determine 'whether Congress has expressly prescribed the statute's proper reach," and, if so, "that ends the matter and we follow Congressional command (assuming such command does not itself violate the Constitution).").

### 1. The Landgraf Test

"Deciding when a statute operates 'retroactively' is not always a simple or mechanical task," *Landgraf,* 511 U.S. at 268, 114 S.Ct. 1483:

> when a case implicates a federal statute enacted after the events giving rise to the suit, a court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, there is no need to resort to judicial default rules. Where the statute in question unambiguously applies to preenactment conduct, there is no conflict between the antiretroactivity presumption and the principle that a court should apply the law in effect at the time of decision. Even absent specific legislative authorization, application of a new statute to cases arising before its enactment is unquestionably proper in many situations. However, where the new statute would have a genuinely retroactive effect—i.e., where it would impair rights a party possessed when he acted, increase his liability for past conduct, or impose new duties with respect to transactions already completed—the traditional presumption teaches that the statute does

not govern absent clear congressional intent favoring such a result.

*Id.* at 269–70, 114 S.Ct. 1483. *Landgraf* prescribes a two-part test: 1) has Congress expressly prescribed the temporal reach of the statute?; and, if not, 2) does the statute have retroactive effect?

### 2. Landgraf Applied

#### a. Express Language Prescribing 127's Temporal Reach

To determine whether Congress has expressly prescribed the statute's proper reach, a court first examines the statute's language to ascertain whether Congress has given an "express command," *see Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483, or an "unambiguous directive" that the law apply retrospectively, *see Martin v. Hadix,* 527 U.S. 343, 119 S.Ct. 1998, 2004, 144 L.Ed.2d 347 (1999).

*Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) observes, "*Landgraf* did not speak to the rules for determining" whether a statute contains an "express command" or an "unambiguous directive." *Lindh,* 521 U.S. at 327, 117 S.Ct. 2059. "In determining a statute's temporal reach generally, our normal rules of construction apply." *Id.* at 326, 117 S.Ct. 2059. Even without ambiguity in the statute, direct or implied evidence of legislative intent is discerned from the statute's structure, legislative history, and the context in which the statute was passed. *See Martin,* 119 S.Ct. at 2004 (structure and legislative history); *Magana–Pizano v. Immigration and Naturalization Serv.,* 200 F.3d 603, 611 (9th Cir. 1999) (legislative history); *Tworivers v. Lewis,* 174 F.3d 987 (9th Cir.1999) (plain language and legislative history); *Jeffries v. Wood,* 114 F.3d at 1495 (context in which the statute was passed). "[E]ven absent explicit statutory language mandating retroactivity, laws may be applied retroactively if courts are able to discern 'clear congressional intent favoring such a result.'" *United States v. Olin Corp.,* 107 F.3d 1506, 1512–13 (11th Cir.1997).

b. *Does the statute have retroactive effect?*

Absent Congress' "unambiguous directive" or "express command" for a statute's retrospective application and if Congressional intent is not clearly stated, the second *Landgraf* inquiry asks whether the statute has retroactive effect. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483; *Martin,* 119 S.Ct. at 2003 ("If there is no congressional directive on the temporal reach of a statute ... then in keeping with our 'traditional presumption' against retroactivity, we presume that the statute does not apply to that conduct."). This inquiry starts with a presumption against retrospectivity. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. Tests to decide if the statute operates retroactively include: "... whether it would impair rights a party possessed when [the party] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. These three categories are not exclusive, they qualify as a "sufficient, rather than a necessary, condition for invoking the presumption against retroactivity." *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 947, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997); *accord Tworivers,* 174 F.3d at 993 (quoting *Hughes* ). Retroactive application of a procedural statute has been consistently rejected when such application would "result in manifest injustice." *Tworivers,* 174 F.3d at 994.

*Landgraf* identifies three types of laws that generally do not have retroactive effect: 1) those authorizing prospective relief; 2) those conferring or removing jurisdiction; and 3) those statutes properly characterized as procedural. *See Fink v. Shedler,* 192 F.3d 911, 914–15 (9th Cir. 1999) (quoting *Tworivers,* 174 F.3d at 994 (quoting *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483)). The label, *i.e.,* procedural or jurisdictional, is not, in and of itself, dis-

positive. *See Fink,* 192 F.3d at 915 (quoting *Martin,* 119 S.Ct. at 2006).

Ultimately, inquiry into whether a statute operates retroactively "demands a common sense, functional judgment," *Martin,* 119 S.Ct. at 2006, which "should be informed and guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations,' " *id.*

B. *CLARIFICATION OR CHANGE OF EXISTING LAW*

■ A second, separate analytical approach to whether a new statute can be applied to pending cases has developed in the case law, premised on whether the statute is a clarification or a change of existing law. If the statute is a clarification, it "accurately restates the prior law" and there is no need for a *Landgraf* analysis because the statute has no retroactive effect. *Piamba Cortes v. American Airlines, Inc.,* 177 F.3d 1272, 1283 (11th Cir. 1999), *cert. denied,* —— U.S. ——, ——, 120 S.Ct. 980, 980, 145 L.Ed.2d 930 (2000), is a leading example: "[C]oncerns about retroactive application are not implicated when an amendment that takes effect after the initiation of a lawsuit is deemed to clarify relevant law rather than effect a substantive change in the law." *Id.* at 1283 (citing *Beverly Community Hosp. Assoc. v. Belshe,* 132 F.3d 1259, 1265 (9th Cir.1997), *Liquilux Gas Corp. v. Martin Gas Sales,* 979 F.2d 887, 890 (1st Cir.1992), and *Boddie v. American Broadcasting Co.,* 881 F.2d 267, 269 (6th Cir.1989)). *Piamba Cortes* does not discuss *Landgraf, Lindh, Martin,* or any other Supreme Court statutory retroactivity case.

"Several factors are relevant when determining if an amendment clarifies, rather than effects a substantive change to, prior law:"

A significant factor is whether a conflict or ambiguity existed with respect to the interpretation of the relevant provision when the amendment was enacted. If such an ambiguity existed, courts view this as an indication that a subsequent

amendment is intended to clarify, rather than change, the existing law.

*Id.* at 1283–84 (citing *Liquilux Gas Corp. v. Martin Gas Sales,* 979 F.2d 887, 890 (1st Cir.1992)). Weight is given to "[a] declaration by the enacting body that its intent is to clarify the prior enactment," the importance of the statute's text and its legislative history. *Id.* at 1284.

After *Landgraf,* the Ninth Circuit, has primarily applied the clarification v. change principle to determine if modifications to the Sentencing Guidelines have retroactive effect. *See e.g., Hernandez v. Campbell,* 204 F.3d 861, 863–64 (9th Cir. 2000) (citing *United States v. Felix,* 87 F.3d 1057, 1060 (9th Cir.1996) (clarifications to the Sentencing Guidelines apply retroactively). The Ninth Circuit has applied the clarification v. change principle in other types of cases. *See Estate of Reynolds v. Martin,* 985 F.2d 470, 475 (9th Cir.1993) (quoting *Ayers v. Allain,* 893 F.2d 732, 754–55 (5th Cir.1990), *vacated on other grounds sub nom. United States v. Fordice,* 505 U.S. 717, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992)).

## V. *THE LANDGRAF ANALYSIS*

### A. *DOES SECTION 127 CONTAIN AN "EXPRESS COMMAND" OR "UNAMBIGUOUS DIRECTIVE" AS TO TEMPORAL REACH?*

#### 1. *Plain Language of Section 127(i)*

"In statutory interpretation, the starting point is always the language of the statute itself." *Jeffries,* 114 F.3d at 1495. Section 127(i), the most explicit temporal reach provision of the Act, prescribes:

(i) Effect On Pending Or Concluded Actions.-The exemptions provided in this section shall not affect any concluded judicial or administrative action or any pending judicial action initiated by the United States prior to enactment of this section.

Plaintiff argues that because there is no explicit statement that Section 127 applies

to pending judicial proceedings brought by a state agency before the date of the enactment, Section 127 does not apply to this case: "[Congress] merely needed to state that the amendment applied to all pending actions, except those brought by the United States." *Lindh* expressly rejected this argument; that for a new statute to apply to a pending case, it must affirmatively state it so applies:

In determining whether a statute's terms would produce a retroactive effect, however, and in determining a statute's temporal reach generally, our normal rules of construction apply. Although *Landgraf*'s default rule would deny application when a retroactive effect would otherwise result, other construction rules may apply to remove even the possibility of retroactivity (as by rendering the statutory provision wholly inapplicable to a particular case).

521 U.S. at 326, 117 S.Ct. 2059.

Augustine argues that 127(i)'s language "confirms that Section 127 applies to *all* actions pending at the time of enactment, *except* those initiated by the United States;" presumably, because Congress had no reason to identify actions to which Section 127 does not apply, unless it intended Section 127 to apply to all other pending cases. The express language of Section 127(i) does not mention retrospective application to pending cases. What the express temporal language does say is that Section 127's exemptions do not apply to any concluded administrative or judicial action, regardless of the identity of the party who initiated the action; or to any pending judicial action initiated by the United States. Steinmeyer's "plain language" argument relies on the statement of purpose that appears in Section 6001. This addresses structure, not plain language and is addressed below.

Sellers argue that Section 127(i) states three limited exceptions to retrospectivity. It expressly mentions three types of actions to which the statute does not apply. To find Section 127 applicable to all other

pending actions, it must be inferred that Congress intentionally omitted mention of pending cases to which Section 127 does apply, because it intended the Act to apply retrospectively to all such cases and instead expressly defined the cases to which the Act does not apply. Sellers contend this "is not merely a 'negative inference.'" Plaintiff responds this interpretation is analogous to the *Lindh* negative inference argument; *i.e.*, if Congress intended retrospectivity, it would have said so. Even assuming this is a "negative inference" interpretation, it is permissible to consider "negative inference" in a retroactivity analysis. *See United States v. Olin Corp.*, 107 F.3d at 1513 ("*Landgraf* 'did not preclude all future use of a negative inference analysis in support of retroactive intent.'") (quoting *State of Nevada v. United States*, 925 F.Supp. 691, 693 (1996)). *Jeffries* compared two chapters of the AEDPA, one expressly retrospective, the other not, to justify not drawing a negative inference to make both retrospective. Section 127 does not have a comparable statutory composition.

The application Sellers seek here is "positive" inference; *i.e.*, the absence of language specifying Section 127 applies to pending actions means Congress intended it to apply; not the converse, since Congress did not say it, the statute cannot apply to pending cases. The language of the Act alone does not contain an express command or unambiguous directive that the statute is to be applied retrospectively to pending judicial actions brought a State.

Amicus and Augustine cite *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–42, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), and *United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir.1995), describing that the first step in statutory interpretation "is to determine whether the language at issue has a plain and unambiguous meaning." *Robinson*, 519 U.S. at 340, 117 S.Ct. 843. The "inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.*

(quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). "Canons of statutory construction dictate that if the language of a statute is clear, we look no further than that language in determining the statute's meaning." *Lewis*, 67 F.3d at 228. These cases, do not explicitly address legislative retrospectivity and use differing terms to define the review standard. *Compare Robinson*, 519 U.S. at 340, 117 S.Ct. 843 ("plain and unambiguous") and *Lewis*, 67 F.3d at 228 ("clear"), *with Martin*, 527 U.S. at 353, 119 S.Ct. 1998 ("unambiguous directive" or "express command").

Steinmeyer cites three cases as authority that the statutory interpretation ceases if the plain language of the statute is clear and unambiguous: *Kaiser Aluminum v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), and *Olin*, 107 F.3d at 1512. *Kaiser Aluminum* holds, "Absent a clearly expressed legislative intention to the contrary, [the statute's] language must ordinarily be regarded as conclusive.'" *Kaiser Aluminum*, 494 U.S. at 835, 110 S.Ct. 1570 (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). *Nordic Village* explicates the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect." *Nordic Village*, 503 U.S. at 36, 112 S.Ct. 1011. Neither case discusses retroactivity. *Olin* recognizes that *Hunter v. United States*, 101 F.3d 1565, 1569 (11th Cir.1996) (en banc), "*left open* the question of whether 'evidence of legislative intent other than in an express statutory command' would satisfy *Landgraf*'s first prong." *Olin*, 107 F.3d at 1512 (quoting *Hunter*, 101 F.3d at 1569) (emphasis added). It concluded "even absent explicit statutory language mandating retroactivity, laws may be applied retroactively if courts are able to discern 'clear con-

gressional intent favoring such a result.'" *Id.* at 1512–13 (quoting *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483).

### 2. *Structure of the Statute*

■ A court must "interpret the statute to give effect to all of its parts." *Estate of Magnin,* 184 F.3d 1074, 1077 (9th Cir. 1999). This includes giving effect, if possible, to every word Congress used, *see National Labor Relations Bd. v. A–Plus Roofing, Inc.,* 39 F.3d 1410, 1415 (9th Cir. 1994); considering "the purpose of the statute 'in its entirety,'" *United States v. Mohrbacher,* 182 F.3d 1041, 1049 (9th Cir. 1999) (citing *Alarcon v. Keller Industries, Inc.,* 27 F.3d 386, 389 (9th Cir.1994))' and examining "whether the proposed interpretation would frustrate or advance that purpose," *id.* (citing *Tierney v. Kupers,* 128 F.3d 1310, 1311–12 (9th Cir.1997)).

#### a. *Historical Retrospectivity of CERCLA Amendments*

Amicus applies a parity of reasoning: since CERCLA is retroactive, it "logically follows" that its amendments, and therefore the Act, are retrospective. Reference is made to how other statutory amendments to CERCLA have been held retrospective, specifically, the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). *United States v. Tyson,* Civ. A. No. 84–2663, 1989 WL 159256 at *8 (E.D.Pa.1989), held "there is no question that [SARA's] provisions apply retroactively." *Id. Tyson* found:

> The legislative history of SARA recognized that courts had previously determined that CERCLA contained an inherent federal common law right to contribution, but Congress thought it necessary to clarify and confirm such right. H.R. 99–253(I) (Energy and Commerce Comm.), 99th Cong., 2d Sess. 79, reprinted in 1986 U.S.Code Congr. & Admin. News 2861. The legislative history of SARA makes clear that the statute's explicit right for con-

tribution was designed to encourage settlements and cleanups.

*Id.* The historical retrospectivity theory is entitled to some weight, but is not conclusive. It is evidence Congress was on notice that courts have retrospectively applied CERCLA amendments.

#### b. *Verb Tense*

Amicus argues every word tense should be given effect; specifically: "[T]he courts have already ruled on numerous occasions that Congress' consistent use of the past tense in outlining the statutory requirements of CERCLA suggest the view that this law was intended to apply retroactively." It contends:

> [t]his rationale should apply with equal validity to the operation of Section 127; just as Congress employed the past tense, in such words as 'operated,' 'arranged,' and 'incurred,' to provide the basis for the pre-enactment retroactive application of CERCLA's liability provisions, Congress has again used the past tense to specify the requirements of Section 127,

relying on *Nova Chemicals, Inc. v. GAF Corp.,* 945 F.Supp. 1098 (E.D.Tenn.1996), which held an amendment to CERCLA retrospective, based, in part, on the recognition that "CERCLA's liability provisions are written in the past tense." *Id.* at 1103. *Nova* cited *Cooper Indus. v. Agway, Inc.,* 1996 WL 550128 at *8–*9 (N.D.N.Y.1996) [*Cooper I* ], an unpublished New York district court case that concluded the choice of past tense in CERCLA's liability provisions "suggests that Congress intended for CERCLA liability to reach back before the enactment date." *See Nova,* at 1103 (quoting *Cooper I* at *9). The use of past verb tense in CERCLA-amendment retrospectivity analysis is not conclusive; it is circumstantial evidence of legislative intent that favors retrospectivity.

#### c. *Statute Headings*

■ The introductory provision of the Act, Section 6001(a), headed "Superfund

Recycling Equity," describes the purposes of the amendment. Section 6001(b) is titled:

>  (b) CLARIFICATION OF LIABILITY UNDER CERCLA FOR RECYCLING TRANSACTIONS. -
>
>  (1) CLARIFICATION—Title I of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) Is amended by adding at the end the following new section,

followed by Section 127:

> "SEC. 127. RECYCLING TRANSACTIONS."
>
> "(a) LIABILITY CLARIFICATION -"
>
> "(1) As provided in subsection (b), (c), (d), and (e) ... shall not be liable ...."

When Congress clarifies a statute, it adds language to show how the law originally was intended to operate. *See Meyerhoff v. United States Environmental Protection Agency*, 958 F.2d 1498, 1502 (9th Cir.1992) (quoting *United States v. Tapert*, 625 F.2d 111, 121 (6th Cir.1980): "An amendment to an existing statute is not an acknowledgment by Congress that the original statute is invalid. It is a common and customary legislative procedure to enact amendments strengthening and clarifying existing laws."). Congress is presumed to understand the legal import of words it uses in light of existing case law. *See Jeffries*, 114 F.3d at 1495. Congress' use of the term "clarification" three times in the operative liability provisions of the statute's text is strong evidence that it intended retrospective effect. It is presumed "Congress legislate[s] with awareness of relevant judicial decisions." *Jeffries*, 114 F.3d at 1495. In this Circuit, judicial decisions clearly establish the retrospective effect of a statutory amendment that is a clarification. *See United States v. Innie*, 77 F.3d 1207 (9th Cir.1996) (quoting *United States v. Sanders*, 67 F.3d 855, 856 (9th Cir.1995): "The Ninth Circuit has consistently stated that when an amendment is a clarification,

rather than an alteration, of existing law, then it should be used in interpreting the provision in question retroactively.") A clarification is enacted for the benefit of the courts and the parties to provide interpretative guidance as to the underlying statute. *See Means v. Northern Cheyenne Tribal Court*, 154 F.3d 941, 951 (9th Cir. 1998) (stating in the concurrence: a clarification is a statement "of what [Congress] believed the law already was" and is applicable "to all cases, past, present and future"). Repeated use of the word "clarification" in the headings of Section 127 is clear, unambiguous, and commanding evidence in favor of retrospectivity.

### d. *Statutory Purpose*

The purposes of Section 127 are to: (1) "promote the reuse and recycling of scrap material;" (2) "create greater equity in the statutory treatment of recycled versus virgin materials;" and (3) "remove the disincentives and impediments to recycling created as an unintended consequence of the 1980 Superfund liability provisions." Sec. 6001(a).

Additional goals of the Recycling Act are to correct improper application of CERCLA's liability scheme and to maintain a healthy recycling industry. Retrospective application is said to "level the playing field," by eliminating the competitive disadvantage for recycled materials compared to virgin materials and the adverse impact of CERCLA liability on recyclers and scrap processors. *See* §§ 6001(a)(1), (2) and (3). The statute effectuates its purposes by granting recyclers an exemption from CERCLA liability.

Sellers overreach in their contention that by the Act, Congress intended to clarify that certain parties "were not to be sued by the State or private parties under CERCLA either in pending or future cases." This suggests Section 127 confers absolute immunity from suit. It does not. Absolute immunity is only granted in ex-

tremely rare cases. *See Bogan v. Scott–Harris,* 523 U.S. 44, 49, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities); *Nixon v. Fitzgerald,* 457 U.S. 731, 733, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (holding a former President is entitled to absolute immunity from damages as to conduct within the scope of his official duties). By prescribing elements of the recycler exemptions that must be proved, and a burden of proof standard (preponderance), Congress made clear the recycler's exemption must be raised as an affirmative defense that requires participation in CERCLA litigation. The Act does not provide immunity from suit, which prohibits a party's inclusion and participation in a lawsuit.

Congress recognized the need to remove "disincentives and impediments to recycling." Expressly carving-out pending judicial actions filed by the United States, supports an inference that there is no reason for Section 127(i)'s specific command excluding such actions from its exemptions, unless the statute retrospectively applies to other pending judicial actions. Retrospective application of the Act advances its purposes by removing the unintended burden and expense on recyclers of CERCLA liability. Congress' declared intent that recyclers were not intended to be liable is advanced by 127's retrospective application. A prospective interpretation to all pending actions would frustrate its purpose that "all other lawsuits brought by private parties or against third party defendants in lawsuits originally brought by the U.S. government will no longer proceed under this legislation." 145 Cong. Rec. S.15028.

#### e. *Express Prospective Language*

Two subsections of 127 address burden of proof, fixing different requirements based on when the transaction occurred.

#### i. *Scrap paper, glass, textiles, or rubber*

Subsection 127(c) exempts arrangers for recycling, who prove:

(1) The recyclable material met a commercial specification grade,

(2) a market existed for the recyclable material,

(3) A substantial portion of the recyclable material was made available for use as feedstock for the manufacture of a new saleable product, and

(4) the recyclable material could have been a replacement or substitute for a virgin raw material, or the product to be made from the recyclable material could have been a replacement or substitute for a product made, in whole or in part, from a virgin or raw material.

Subsections (1) thorough (4) apply to recycling transactions *before* 127's enactment. Subsection 127(c)(5) applies to transactions "occurring ninety days or more *after* date of enactment of section" (emphasis added). For such prospective transactions only, the required proof is that the recycler:

exercised reasonable care to determine that the facility where the recyclable material was handled, processed, reclaimed, or otherwise managed by another person (hereinafter in this section referred to as a "consuming facility") was in compliance with substantive (not procedural or administrative) provisions of any Federal, State or local environmental law or regulation, or compliance order or decree issued pursuant thereto, applicable to the handling, processing, reclamation, storage, or other management activities associated with recyclable material.

Subsections (c)(1)-(4), which define the nature and past use of the recyclable material, are clarifying and retrospective. If not, there is no reason for Congress to prospectively impose only on post-enactment transactions, the additional requirements of § 127(c)(5). This is additional circum-

stantial evidence from which retrospective temporal reach can be inferred.

### ii. *Difference in Proof Standards for Scrap Metal*

Scrap metal recycling is also subject to different burdens of proof if the transaction is before or after Section 127's enactment. Subsection 127(d)(1)(A) requires a person who arranged for recycling scrap metal to prove compliance with subsection 127(c), making applicable the temporal requirements of subsections (1)-(5) discussed above. In the next subsection, 127(d)(1)(B), Congress specifies that proof of compliance with the newly enacted laws is only required "with regard to transactions occurring after the effective date of such regulations or standards." If Congress intended section 127 in its entirety to apply prospectively, there is no reason for subsection 127(d)(1)(A) to incorporate 127(c)'s past-transaction requirements, nor for subsection 127(d)(1)(B) to specify its applicability solely to post-enactment transactions. A statute should be interpreted to give effect to all of its provisions. *See Estate of Magnin,* 184 F.3d 1074, 1077 (9th Cir.1999). This is further evidence of intent that favors retrospectivity.

### C. *LEGISLATIVE HISTORY*

Legislative history also aids the interpretation of a statute's language and effect. *See Landgraf* 511 U.S. at 249, 263, 114 S.Ct. 1483.

> In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent *lies in the Committee Reports on the bill,* which "represent[ ] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation."

*Garcia v. United States,* 469 U.S. 70, 73, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)) (emphasis added); *accord Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1082 (9th Cir.1999) ("This circuit relies on official committee reports when considering legislative history, not stray comments by individuals or other materials unrelated to the statutory language or the committee reports.").

Sellers argue that any finding other than Section 127 is retrospective: "simply ignores the fact that *every* statement of legislative intent that informed Congress' vote, including the official Legislative History, made clear that Section 127 was meant to apply retrospectively. There was no debate about this point because *there was no disagreement.*" However, there is no pre-enactment legislative debate of record for Section 127.

The "legislative history," to which Sellers refer are the entries into the Congressional Record for Section 127. *See* 145 Cong. Rec. S15048–49. S.1528 was introduced by Senator Lott on August 5, 1999. *See id.* at S10431. The bill was immediately referred to the Senate Environment and Public Works Committee, *see id.* at S10389, there is no evidence that the committee reported on it. References to S.1528 in the Congressional Record were made almost exclusively when co-sponsors were added.

The remarks of Senator Lott, the primary sponsor of S.1528, cannot be ignored. *Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986), holds that "statements by individual legislators should not be given controlling effect, but when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent." *Brock,* 476 U.S. at 263, 106 S.Ct. 1834. Here, the statements of Senator Lott are consistent with the "legislative history." This is not surprising, because Senator Lott introduced the legislative history. S.1528, was a rider to the Omnibus Appropriations Act. There was no committee, House, or Senate floor debate. *Brock* does not address such a situation.

*Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96

S.Ct. 2295, 49 L.Ed.2d 49 (1976), directs that an explanation provided by one of the legislation's sponsors during floor debate "deserves to be accorded substantial weight in interpreting the statute." *Algonquin*, 426 U.S. at 564, 96 S.Ct. 2295. Senator Lott's statements are entitled to such weight. Assuming *Algonquin* applies, Senator Lott was not the only "chief" sponsor; he was joined by Senate Minority Leader Daschle, Senators Warner, Chafee, Baucus, and Lincoln, in introducing the Act. *See* 145 Cong. Rec. 10431.[3] Under *Algonquin*, the statements of each of these Senators are also considered. *Accord Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394–95, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) ("The fears and doubts of the opposition are no authoritative guide to the construction of legislation. *It is the sponsors that we look to when the meaning of the statutory words is in doubt.*") (emphasis added).

In at least one circumstance, the Ninth Circuit has given "greater weight" to the statements of individual legislators. *See Mount Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1453–54 (9th Cir.1992). *Mount Graham* interpreted Section 602(a) of the Arizona–Idaho Conservation Act, *see id.* at 1451–52, for which the legislative history was "exceedingly sparse:"

> the legislation was passed quickly; no committee hearings were held. The bill originated in the Senate where it was sponsored by both Arizona Senators. One week after the bill's passage in the Senate, it was adopted by the House with hardly any discussion. In total, the Congressional Record reports the statements of only three Senators and three Representatives. Both Arizona Senators commented on the bill during Senate deliberations, and two of the five Arizona Representatives did so during consideration in the House.

*Id.* at 1453–54 (footnote omitted). The court gave "greater weight than [they] otherwise might" to the statements of individual legislators who spoke on behalf of the legislation because the Arizona–Idaho Conservation Act was:

> special legislation relating to a special project in a particular state, because there were no committee reports and instead the legislators from the affected state explained the project and its impact on the floor, and because no legislator spoke in opposition to the bill.

*Id.* at 1454.

*Mount Graham* has been interpreted to mean where other statutory tools are not determinative, legislative statements can be helpful to determine statutory meaning and Congressional intent. *See United States v. van den Berg*, 5 F.3d 439, 443 (9th Cir.1993) (citing *Mount Graham*, 954 F.2d at 1453). Here, the legislative history is even more sparse. All legislative statements, including those by non-sponsors, are considered.

### 1. *Senator Lott*

Senator Lott's initial statement about the Act was made October 25, 1999: "The bill is not intended to plow new Superfund ground, nor is it intended to revamp existing Superfund law." 145 Cong. Rec. S13086 (Oct. 25, 1999). Among Senator Lott's relevant statements:

- "We had one and only one purpose in introducing the Superfund Recycling Equity Act-to remove from the liability loop those who collect and ship recyclables to a third party site."

- "While the bill proposes to amend Superfund, Mr. President, it is really a recycling bill. Recycling is not disposal and shipping for recycling is not arranging for disposal-it is a relatively simple clarification, but one that is

---

**3.** According to Sen. Lott, the Senate bill had 68 bipartisan co-sponsors. 145 Cong. Rec. S.

151051 (Nov. 19, 1999).

necessary to maintain a successful recycling effort nationwide."

- "S.1528 addressed only one Superfund issue-the unintended consequence of law that holds recyclers responsible for the actions of those who purchase their goods."

Senator Lott explicitly emphasizes the corrective purpose of S.1528:

CERCLA has created a competitive disadvantage between virgin materials used as manufacturing feedstocks and recyclable material used for precisely the same purpose ... *our bill corrects this unintended consequence of Superfund. It recognizes that recycling is not disposal.* That recyclers are not subject to Superfund's liability scheme should the owners of * * *mills, foundries, or refineries, to which recyclers ship their material, contaminate their facilities.

145 Cong. Rec. S10431 (emphasis added).

He observed that throughout the "negotiations" on the bill's language, "there ha[d] been quite a bit of misrepresentation of the purpose of the bill," *id.* at S15048, however:

S.1528 was negotiated in 1993 between representatives of the industry that recycles traditional materials-paper, glass, plastic, metals, textiles and rubber-and representatives of the Environmental Protection Agency, the Department of Justice, and the national environmental community.

At the end of his remarks, he requested "unanimous consent that the legislative history be inserted in the RECORD," *id.* It was.

The legislative history includes a statement of purpose: "The [Act] (the language of S.1528) seeks to correct the unintended consequence of CERCLA that actually discourages legitimate recycling." 145 Cong. Rec. S15048. Specific "legislative history" addresses the Act's temporal reach provision:

Section 127 shall not affect any pending judicial action brought by the United States prior to enactment of this section. Any pending judicial action, whether it was brought in a trial or appellate court, by a private party shall be subject to the grant of relief from liability. For the purposes of this section, Congress intends that any third party action or joinder of defendants brought by a private party shall be considered a private party action, regardless of whether or not the original lawsuit was brought by the United States. Additionally, any administrative action brought by any governmental agency but not yet concluded as set forth above, shall be subject to the grant of relief from liability set forth in this 127.

145 Cong. Rec. S15050. This explicitly provides for Section 127's retrospective application to judicial proceedings brought by private parties *and* to any administrative action brought by any "*governmental agency,*" such as the DTSC.

No mention is made of pending judicial actions brought by any governmental agency anywhere in the statute or its legislative history. This could be an unintended oversight or an intended omission. State agency administrative actions can result in investigation, remediation, and response orders which have adverse financial consequences to PRPs. It is reasonable to infer that the same retrospective treatment should be applied to pending State judicial actions. No party suggests relief from liability in a state agency administrative action has a substantively different effect from relief from liability in a State judicial action. That Congress knew this and so intended, can further be implied from its recognition in other pre-127 sections of CERCLA that States and their governmental agencies bring CERCLA actions, independent of the United States. *See Washington State Dep't of Transp. v. Washington Natural Gas Co., Pacificorp,* 59 F.3d 793, 801 (9th Cir.1995).

After the November 19 reading of the "legislative history," the Senate agreed to the Conference Report of the omnibus bill,

which includes the text of the Act, but no commentary about it. *See id.* at S15059. *See id.* at S15048 & S15059. On November 29, 1999, the President signed the bill into law. This legislative history reflects Senator Lott's "understanding" and intent that the bill was retrospective, except as the statute specifically states to the contrary in 127(i).

### 2. *Senator Lincoln*

Senator Lincoln's November 19, 1999 remarks explicitly address retrospectivity:

> [T]his Superfund Recycling Equity Act is *both retroactive and prospective.* Slightly different standards must be met for recyclers to be *relieved of Superfund liability for recycling transactions that occurred prior to the date of enactment* than for those that occur after the date of enactment. But in either scenario, legitimate recyclers ... will no longer be treated as if they were "arranging for disposal of materials containing hazardous substances each time they sell their materials as manufacturing feedstocks ....
>
> Recognizing that this issue has been the focus of much litigation, the Congress intended that the recycling situation be clarified through [this] Act, that is why we have written this legislation in such a fashion that virtually all lawsuits that deal with recycling transactions of paper, glass, plastic, metals, textiles, and rubber are extinguished by this legislation. Only those lawsuits brought prior to enactment of this legislation directly by the United States government against a person will remain viable.

145 Cong. Rec. S15028 (emphasis added).

### 3. *Senator Daschle*

The commentary of Senator Daschle, made on the Senate floor January 26, 2000,

is post-enactment, almost two months after the bill became law. *See* 146 Cong. Rec. S76. In the Ninth Circuit, "post-enactment legislative history is generally considered to be of minimal assistance in interpreting a statute." *Slaven v. BP America, Inc.,* 973 F.2d 1468, 1475 (9th Cir.1992).[4] Nonetheless, since Senator Daschle was a cosponsor of S.1528, his remarks are considered:

> Mr. President, I take this opportunity to correct an inadvertent but significant error in the CONGRESSIONAL RECORD of November 19, 1999, the last day of the first session of this Congress. It concerns a statement submitted for the Record by Senator LOTT (145 CONGRESSIONAL RECORD S150048) regarding the Superfund Recycling Equity Act ... The statement erroneously was attributed to both Senator LOTT and me. In fact, the statement did not then and does not now reflect my understanding of the Superfund recycling amendments.
>
> I make this clarification at the earliest opportunity, in order to minimize the possibility of any mistaken reliance on the statement as the consensus view of two original cosponsors, *particularly with respect to the availability of relief in pending cases.*

*Id.* (emphasis added). Although he appears to disagree with Senator Lott's legislative history about availability of relief in pending cases, he does not set forth his interpretation. His statements are of minimal assistance to the analysis.

He also suggested courts use S. 1834 from the 103d Congress, which had an extensive Senate Committee Report, as an interpretative tool. *See id.* at S76.[5] The Supreme Court disavows reliance on intro-

---

**4.** DTSC asserts *Bread Political Action Committee v. Federal Election Commission,* 455 U.S. 577, 582 n. 3, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982), holds that post-enactment comments are entitled to "no weight at all." This is not *Bread*'s holding. *Bread* decided that a post-hoc affidavit of a legislator submitted to

a court as evidence of legislative intent carries "little, if any, weight." *Id.*

**5.** This Senate Report for S.1834, has no reference to retrospectivity or temporal application of the recycler exemption.

duced bills or even bills passed by prior Congresses, but not enacted. *See Landgraf,* 511 U.S. at 263, 114 S.Ct. 1483. Amicus correctly notes pre-*Landgraf* Ninth Circuit authority held: "In ascertaining the intent of Congress, we see no objection to giving *some weight* to clear legislative histories of prior bills that *are identical* to the law we are called on to interpret." *State of Arizona v. Atchison, Topeka and Santa Fe Railroad Co.,* 656 F.2d 398, 404 n. 6 (9th Cir.1981) (emphasis added).[6] Senator Daschle's suggestion that S. 1834 from the 103d Congress should be used as legislative history is not probative. *Accord United States v. The Atlas Lederer Co.,* No. C–3–91–309 (S.D.Ohio Feb. 16, 2000).

From Senator Daschle's post-enactment comments, it may be inferred that one chief co-sponsor was not uniform in his interpretation of Section 127(i). However, no other legislative history, sponsor statement, or other legislator's comment suggests Section 127 is not retrospective. Senator Daschle's late comments are entitled to no more than minimal weight. They do not diminish the fact and substance of Section 127's pre-enactment "legislative history" favoring retrospectivity nor the post-enactment statements of Senators Lott and Lincoln to the same effect.

### 4. *Non–Sponsors*

Generally, the remarks of individual, non-sponsor legislators as to the legislative history of a statute are not accorded great weight, *see Hoonah Indian Ass'n v. Morrison,* 170 F.3d 1223, 1228 (9th Cir.1999) ("The remarks of an individual legislator on the floor are not part of the statute passed by both houses and signed by the President, so they lack the force of law."). The remarks of other legislators are rele-

vant indica as to unity, or lack of it, as to interpretation. *Id.* at 1228.

Two other legislators made remarks concerning Section 127. On November 18, 1999, the date the Omnibus Appropriations Act was sent to the President, Representative Obey commented on the House Floor about the Recycling Equity Act:

> This bill reminds me of what Churchill said about Russia, "A riddle wrapped in a mystery inside an enigma." We do not have any idea what that bill is really going to do in the fine print.

145 Cong. Rec. H12732. Representative Obey's statement is an opinion that suggests he believed the statute was subject to differing interpretations.

Representative Michael G. Oxley specifically addressed Section 127(i) in his December 3, 1999 comments:

> One reason for this amendment is to ensure that where a judicial or administrative action has been fully complied with, this bill will not force persons who believed that they had fully settled their liability and claims to revisit those issues.
>
> However, where a consent decree or other judicial order requires enforcement of its terms after the date of enactment, nothing in this section should be interpreted to prevent a person subject to such future obligations in light of the passage of this legislation.... Nothing in this legislation prevents parties from filing motions under rule 60(b) of the Federal Rules of Civil Procedure to reopen the consent decree with respect to future obligations.

145 Cong. Rec. E2536. These comments address the finality of concluded judicial or administrative actions, but leave open the right of recyclers, subject to a consent

---

**6.** Amicus argues the legislative histories of two similar bills from the 103d Congress: H.R. 3800 and S.1834, should be considered, claiming that H.R. 3800 contained provisions "virtually identical" to those contained in Section 127. No explanation is provided as to how the text of S.1834 compares with

Section 127, except that both bills "had essentially identical goals." *Atchison, Topeka,* a 1981 case decided before *Landgraf,* requires that prior bills be *identical.* An examination of H.R. 3800 and S.1834 indicates their language is not identical to that of S.1528.

decree or other judicial order imposing CERCLA obligations, to challenge and inferentially to seek to limit their future obligations in light of Section 127, regardless of who filed the suit.

Neither non-sponsor's statements detract from retrospectivity-favoring legislative intent. On balance, the statements of all individual legislators weigh heavily in favor of retrospectivity. The language and discernable legislative intent that Section 127 is retrospective, are interpretable as an express command. Only pending judicial actions by United States and concluded judicial and administrative CERCLA actions have been carved out from retrospective application. Arguably, the *Landgraf* inquiry ends. *See Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483; *accord United States Securities and Exchange Commission v. Fehn*, 97 F.3d 1276, 1285 (9th Cir. 1996) ("If Congress has [expressly prescribed the statute's proper reach], 'there is no need to resort to judicial default rules,' since the statute guides its application.").

### D. APPLICATION OF THE SECOND LANDGRAF INQUIRY: RETROACTIVE EFFECT

Assuming, arguendo, the express language analysis is inconclusive, the focus turns to: Does the law have retroactive effect? This is determined by:

> whether the statute 'would impair rights a party possessed when [the party] acted, increase a party's liability for past conduct, or impose new duties with respect to a transaction already completed.'

*Tworivers*, 174 F.3d at 993 (quoting *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483). A finding of one or more of these conditions is not a prerequisite to finding retroactive effect. *Tworivers*, 174 F.3d at 993 (these three conditions are a "sufficient, rather than a necessary, condition for invoking presumption against retroactivity") (quoting *Hughes*, 520 U.S. at 947, 117 S.Ct. 1871). It also must be determined if retroactive application "results in 'manifest injustice.'" *Fink*, 192 F.3d at 915. Manifest injustice is measured by the effect Section 127 has on the rights, duties, and liabilities of the parties. A statute is not retroactive because it applies to transactions that precede the statute's enactment or "upsets expectations based on prior law." *Landgraf*, 511 at 269, 114 S.Ct. 1483.

DTSC does not suggest its liability for past conduct is increased or that the statute imposes new duties on it. DTSC argues that its "rights" are impaired because the amendment "has potentially eliminated a cause of action that existed previously and has deprived [it] of the right to seek recovery against a certain class of parties." The answer to this contention is that recyclers who can satisfy the requirements of Section 127 should not have been liable under the pre–127 law, and are not proper sources of recovery.[7] Nor are DTSC's rights impaired if other defendants, as third-party plaintiffs or third-party defendants, *inter sese*, cannot recover indemnity or contribution from each other; if they are recyclers engaged in environmentally responsible activities. No defendant or third-party has argued against retroactivity, even assuming, arguendo, different liability would have attached under the pre-Section 127 law.

No new duties are imposed with respect to already completed transactions that underlie this case. The DTSC seeks cost recovery for site investigation and remedi-

---

7. Sellers, citing *Hughes Aircraft Corp. v. United States*, 520 U.S. 939, 949, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), argue a variation of this premise; *i.e.*, a government agency can have no "right" in the application of law except as Congress prescribes, for such agencies only act in the public interest. Congress has legislated, by enacting 127, in the public interest to exempt recyclers. This is the law. DTSC has no "right" to derogate the recycler's exemption.

ation.[8]  It was not a participant in any transaction for which it seeks to hold parties liable. The DTSC incurs costs in its CERCLA enforcement efforts. No one suggests the DTSC will incur more costs or suffer greater expense to investigate, analyze, enforce, and remediate the Site if some parties are exempt from liability as recyclers, or if third-party actions against recyclers for indemnity or contribution are barred. DTSC has not suggested any way in which 127 imposes on it any additional duty or greater burden. The DTSC has no interest in whether other parties are indemnified from other sources of recovery. DTSC has not asserted it has undertaken any conduct in reliance on pre–127 law in which it would not have engaged if no recyclers' exemption had been enacted. It does not identify any vested expectation it held that has been defeated by 127's application to this case. If application of a statute makes no difference to a party's conduct, it is not retroactive. *See Bradley v. School Bd. of Richmond,* 416 U.S. 696, 721, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

### 1. Federal Savings Statute

■  Plaintiff also argues applying Section 127 conflicts with the general federal savings statute, 1 U.S.C. § 109, which provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. The expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfei-

ture, or liability incurred under such statute, unless the temporary statute shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109. This statute applies to amendments in addition to repeals of statutes. *See Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, 836, *as amended,* 125 F.3d 1281, (9th Cir.1997) (citing *Korshin v. Commissioner,* 91 F.3d 670, 673 n. 5 (4th Cir.1996), and *United States v. Breier,* 813 F.2d 212, 215 (9th Cir.1987)). The saving clause, however, does not extend to statutory clarifications which do not change the law. *Compare United States v. Kolter,* 849 F.2d 541, 544 (11th Cir.1988) (changing the statutory definition of a term is not subject to the savings clause), and *United States v. Adair,* 649 F.Supp. 61, 62 (S.D.Tex.1986) (same), *with United States v. Breier,* 813 F.2d 212, 216 (9th Cir.1987) (finding that the amendment repealed a "liability" and consequently applied the savings clause).

The analysis turns on whether Congress intends a statute to have retrospective application. It is presumed "Congress was familiar with the federal savings clause and had it intended to alter the effect given to conduct before the amendment it would have so indicated." *Breier,* 813 F.2d at 216. Here, Congress has so indicated. It expressly states that Section 127 does not apply to any pending judicial action initiated by the United States, indicating that Section 127 is intended to apply to pending cases by all other parties. DTSC cannot invoke the federal savings clause.

---

**8.** Sellers correctly note that CERCLA § 111(a)(1) limits use of Superfund money to payment of response costs incurred by the United States under § 104. State agencies can recover their own resources applied for cleanup without use of Superfund money. *See Orange Environment, Inc. v. County of*

*Orange,* 860 F.Supp. 1003, 1026 (S.D.N.Y. 1994). Sellers persuasively argue that Congress had an incentive to limit retroactive application to protect recovery to augment the Superfund in pending United States actions, that in no way exists in independent State initiated and funded CERCLA actions.

Sellers refer to the principle that "the government should accord grace to private parties disadvantaged by an old rule when it adopts a new and more generous one." *Landgraf,* 511 U.S. at 276 n. 30, 114 S.Ct. 1483; *see also Campbell v. United States,* 809 F.2d 563, 575 (9th Cir.1987) ("[T]he fact that the party adversely affected by the new law is a government entity makes a finding of manifest injustice less likely."). DTSC impliedly suggests that because it acts at taxpayer expense in CERCLA enforcement actions, this "generosity" principle is inapplicable. This erroneously assumes recycler liability was the correct outcome under pre–127 law.

### 2. *Time of Decision Rule*

The Amicus argues under *Bradley,* "[i]n the absence of a clear statutory directive to the contrary, the Act should be applied by the Court in this case as the law in effect at the time of decision." *Bradley* considered what happens when the law changes while a final judgment is on direct review. *See Bradley,* 416 U.S. at 710, 94 S.Ct. 2006. The *Bradley* principle applies the law in 'effect at the time a court renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Id. Bradley* does not address a change in the law while a case is pending in a district court.

*Landgraf* acknowledges *Bradley*'s time of decision rule: "There is, of course, no conflict between that principle and a presumption against retroactivity when the statute in question is unambiguous." *Landgraf,* 511 U.S. at 273, 114 S.Ct. 1483. *Landgraf* does not suggest *Bradley* applies in any context except to pending appeals of final judgments. The *Bradley* time of decision principle does not provide guidance in this case.

Congressional intent clearly expresses that recycling serves the environment and the public interest. The statute has for its purpose more than limiting the liability of recyclers. It seeks to advance recycling and to protect the recycling industry. Applying Section 127 to currently pending cases that were not filed by the United States, only alters the rights of parties in cases where a recycler engaged in a recycling transaction for which liability was previously found under a misinterpretation or misapplication of pre-November 29, 1999 CERCLA liability principles, with resulting "unintended consequences." Section 127 does not operate retroactively.

To the extent that the new liability scheme will more effectively effectuate the goals of CERCLA, Plaintiff cautions:

> It will frequently be true ... that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity.

*Landgraf,* 511 U.S. at 285–86, 114 S.Ct. 1483. For all the reasons stated above, even if, arguendo, retroactive effect existed, retroactive application of Section 127 does not result in manifest injustice to the DTSC. The Section 127 recycler exemption is applicable to the parties' prior transactions in this case. The United States does not contend otherwise. It did not "initiate" this action. *See* § 127(i).

### VI. *DISCUSSION:*

### *CLARIFICATION v. CHANGE*

The alternative approach to retroactivity, exemplified by *Piamba Cortes,* scrutinizes whether a statute represents a clarification in the law, rather than a change. If the statute clarifies, it is presumed to be retrospective, but not retroactive. Defendants and the Amicus argue that Section 127 is a clarification of CERCLA liability for recyclers engaged in recycling transactions of recyclables. Their starting point is that many courts have found CERCLA an ambiguous statutory scheme, in need of clarification. *See Rhodes v. County of Darlington, S.C.,* 833 F.Supp. 1163, 1174 (D.S.C.1992); *Mid Valley Bank v. North*

*Valley Bank,* 764 F.Supp. 1377, 1387 (E.D.Cal.1991).

## A. *PLAIN LANGUAGE*

Section 127's plain language does not expressly state it applies to pending judicial actions filed by state agencies. Plaintiff maintains that Section 127 adds an entirely new liability section to CERCLA. It cites *Ortland v. County of Tehama,* 939 F.Supp. 1465, 1472 (E.D.Cal.1996), which conducted a California state-law retroactivity analysis, *see id.* at 1471. Augustine claims California state law and federal retroactivity jurisprudence are similar. In a federal court, a case arising under federal law is governed by federal, not state, law of statutory interpretation. *See Hossaini v. Western Missouri Medical Ctr.,* 140 F.3d 1140, 1144 (8th Cir.1998) ("It is axiomatic that federal law governs questions involving the interpretation of a federal statute.").

## B. *STRUCTURE*

### 1. *Statement of Purpose*

Defendants contend the plain language of Section 127 indicates that it was passed to clarify existing liability of recyclers and applies retrospectively. Augustine focuses on the following Section 127 language:

(a) *PURPOSES—The purposes of this section are—*

\* \* \* \* \* \*

(3) to remove the disincentive and impediments to recycling created as an unintended consequence of the 1980 Superfund liability provisions.

It reads this language as intended to clarify that "recycling transactions are exempt from CERCLA," and that Congress passed Section 127 to rectify "judicial misinterpretation."

Steinmeyer refers to no specific language in Section 127, but contends:

If Congress had meant to impose CERCLA liability for recycling activity back at the time of original passage in 1980, but in 1999 had decided that this decision had been a poor one, the Act would not begin with Congress' description of its mistake, the unintended consequences, and the remedial plan.

Congress refers to "unintended consequences" and has designed a statute which exempts recyclers of recyclable materials from CERCLA liability. The reasonable inference drawn from the statute's structure is that past recycler liability has caused unintended adverse consequences to recycling and the recycling industry, which frustrates responsible waste management. Although the statement of legislative purpose is not conclusive, it is strong evidence Congress intended to bring uniformity to federal court decisions involving recycler CERCLA liability.

### 2. *Headings*

Augustine contends weight should be given to the fact Congress repeatedly used the term "Clarification" in Section 127's titles. Statutory titles, "[f]or interpretive purposes, [are] of use only when [they] shed light on some ambiguous word or phrase." *Pennsylvania Department of Corrections v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (quoting *Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528–529, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947)); *see also Oregon Public Utility Com'n v. Interstate Commerce Commission,* 979 F.2d 778, 780 (9th Cir.1992) ("The title of a statute can be used to resolve ambiguity, but the title cannot control the plain meaning of a statute."). Amicus also relies on *Immigration and Naturalization Serv. v. Center for Immigrants' Rights, Inc.,* 502 U.S. 183, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991), which reinforces that: "the title of a statute or section can aid in resolving an ambiguity in the legislation's text." *Id.* at 189, 112 S.Ct. 551. There, the Court relied on titles, and on the agency's interpretation of the regulations. *See id.* at 190, 112 S.Ct. 551. EPA has not yet interpreted Section 127. The Agency's interpretation is neu-

tral. The titles are entitled to persuasive effect.

Sellers contend the statute contains "no fewer than three statements that Section 127 is a clarification of existing law." The "statements" on which they rely are the amendment's titles. *Beverly Community Hosp. Ass'n v. Belshe,* 132 F.3d 1259 (9th Cir.1997), holds: "While titles of acts are not part of the law, they can be used to resolve ambiguity in a statute, so long as they do not contradict the actual text." *Id.* at 1266 n. 6. Reading Section 127's titles in conjunction with the text and statement of legislative purpose, there is no contradiction. The titles support a finding the legislature intended Section 127 to be a clarification.

## C. *CONTEXT*

Another aid to statutory interpretation is the context in which the statute was enacted. It is presumed "Congress legislated with awareness of relevant judicial decisions." *Jeffries,* 114 F.3d at 1495; *see also Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 184–85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988). Amicus emphasizes there was a great deal of uncertainty regarding whether parties engaged in recycling transactions should be viewed as "arrangers" or "transporters" for disposal under CERCLA. *See South Florida Management Dist. v. Montalvo,* 84 F.3d 402, 406 (11th Cir.1996) ("CERCLA does not define the phrase 'arranged for.' Congress has left this task to the courts, and the courts have at times struggled with the contours of 'arranger' liability under § 107(a)(3)."). At the time of Section 127's enactment, CERCLA recycler liability was not consistent. In some districts, recyclers were held liable as arrangers or transporters for disposal, while in others, recyclers were not liable, on the theory "recycling" is not "disposal" or that the recycled materials were either not "waste" or not "hazardous."

### 1. *The Source of "Arranger Liability"*

When CERCLA was enacted, Congress provided no express direction as to the application of Section 9607(a)(3) "arranger liability." This was recognized in *United States v. New Castle County,* 727 F.Supp. 854 (D.Del.1989):

> Congress did not, to say the least, leave the floodlights on to illuminate the trail to the intended meaning of arranger status and liability.

*Id.* at 871 (citing *United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373, 1380 & n. 8 (8th Cir.1989)).

Courts have not found CERCLA's legislative history helpful. In *Aceto,* the Eighth Circuit traced the legislative history and evolution of the phrase "arranged for:"

> Although the 96th Congress had considered numerous proposals concerning liability and compensation for environmental pollution, the bill which ultimately became law was hurriedly put together by a bipartisan leadership group of Senators (the "Stafford–Randolph Compromise"), and was passed after very limited debate by a lame duck Congress. *See New York v. Shore Realty Corp.,* 759 F.2d 1032, 1039–40 (2d Cir.1985); Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980,* 8 COLUM. J. ENVTL. L. 1, 1 (1982). *See also Developments, Toxic Waste Litigation,* 99 HARV. L. REV. 1458, 1465 n. 1 (1986).
>
> Of the three bills which were reported out of committee, only two contained provisions analogous to the "arranged for" provision in section 9607(a)(3). H.R. 7020, the "Hazardous Waste Containment Act," was in the form of an amendment to RCRA and proposed to regulate inactive hazardous waste sites, extending liability to "any person who caused or contributed to" a release or threatened release of hazardous substances. H.R. 7020, 96th Cong., 2d Sess. (1980), cited in *Shore Realty Corp.,*

759 F.2d at 1044. *See* Grad, *supra*, 8 COLUM. J. ENVTL. L. at 4–6; Comment, *"Arranging for Disposal" Under CERCLA: When is a Generator Liable?*, 15 ENVTL. L. REP. 10160, 10163 (1985).

*Aceto*, 872 F.2d at 1380 n. 8. The Eighth Circuit concluded that the legislative history of CERCLA "sheds little light on the intended meaning" of Section 9607(a)(3)'s provision of liability for persons who "by contract, agreement or otherwise arranged for" the disposal of hazardous substances. *Id.* at 1380. CERCLA, as originally enacted, does not per se address recycling, recycled materials, or recycler liability. It provides no express exemption for recycling or recyclers.

#### 2. *Pre–Section 127 Arranger Liability*

Courts have liberally interpreted the phrase "arranged for" from the outset of CERCLA. *See Aceto*, 872 F.2d at 1380; *see also New Castle*, 727 F.Supp. at 871 ("[T]he term should be given a liberal interpretation."). The purpose for liberal judicial interpretation is for liability to "reach back through the causal chain from those who ultimately dispose of a hazardous substance to those who transport and generate it." *Pneumo Abex Corp. v. High Point, Thomasville and Denton Railroad Co.*, 142 F.3d 769, 774 (4th Cir.1998).

Shortly after the passage of CERCLA, however, courts began to recognize that "liability for releases under § 9607(a)(3) is not endless." *United States v. A & F Materials Co.*, 582 F.Supp. 842, 845 (S.D.Ill.1984). No bright-line rule has evolved to determine when liability cuts off. Rather, federal courts have defined the contours of 9607(a)(3) liability on a case-by-case basis, continuously emphasizing that whether an "arrangement" constitutes one for disposal depends on the facts of each case. *See Associates, L.P. v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 164 (2d Cir.1999) ("[A]s a general matter, '[w]hether an 'arrangement for' disposal exists depends on the facts of each

case,' "); *United States v. Cello–Foil Products, Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996) (a court must look at the "totality of the circumstances"); *South Florida*, 84 F.3d at 407 ("Courts must focus on all of the facts in a particular case."); *Pneumo*, 142 F.3d at 775 (quoting *United States v. Petersen Sand & Gravel*, 806 F.Supp. 1346, 1354 (N.D.Ill.1992): "A party's responsibility ... must by necessity turn on a fact-specific inquiry into the nature of the transaction."). Clarifying classes of persons, types of materials, activities, and transactions that satisfy a recycling exemption is not inconsistent with pre-existing arranger and transporter jurisprudence.

#### 3. *Did a Pre–Section 127 Recycling Exemption Exist?*

Any historical "recycling exemption" has evolved through two different analytical constructs.

##### a. *The Useful Products Analogy*

The first is by analogy to the "useful products" doctrine. The "useful products doctrine" is one of three general approaches courts apply to determine whether a transaction is "arranged for" disposal. *See South Florida*, 84 F.3d at 406–07; Maralyn Milne Reger, Comment, *A Uniform Approach for Determining Arranger Liability Under CERCLA*, 1998 B.Y.U. L. REV. 1241, 1243 n. 13 (1998). If the product is "useful," it is not being "disposed of." *See South Florida*, 84 F.3d at 406–07 (11th Cir.1996) (citing *AM Int'l, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 999 (6th Cir.1993) (the chemicals in question "were useful and had value," their transfer was not a disposal), and *Prudential Ins. Co. v. United States Gypsum*, 711 F.Supp. 1244, 1254 (D.N.J.1989) (no liability for products containing hazardous materials which were part of a sale of a substance for use in the construction of a building, rather than "an affirmative act to get rid of the [material] beyond the sale of it as part of a complete, useful

product"); *United States v. Conservation Chemical,* 619 F.Supp. 162 (D.Mo.1985), *rev'd on other grounds, United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726 (8th Cir.1986).[9]

As the "useful product" defense developed, recyclers began to argue their status alone should exempt them from CERCLA liability. *See Chesapeake and Potomac Telephone Co. v. Peck Iron & Metal Co.,* 814 F.Supp. 1269, 1275 (E.D.Va.1992) (arguing unsuccessfully "that the sale of spent lead acid batteries to a lead reclamation operator for recycling does not constitute an arrangement for disposal or treatment"); *Ekotek Site PRP Committee,* 881 F.Supp. 1516, 1525–27 (D.Utah 1995) (despite the value of recycled oil and the national policy in support of reprocessing used oil, shipment for recycling of used oil was subject to CERCLA liability, and was "waste," not a "useful product").

Depending on the jurisdiction, the "useful product" inquiry focuses on whether the material remains useful in its original capacity, *see Cello–Foil,* 100 F.3d at 1232 n. 1 (CERCLA liability will not flow from "the sale of a useful hazardous substance for its original purpose"); *accord Reading Co. v. City of Philadelphia,* 823 F.Supp. 1218, 1237 (E.D.Pa.1993); or "whether [the materials] were a commercially valuable product at the time of sale," *RSR Corp. v.*

*Avanti Development, Inc.,* 69 F.Supp.2d 1119, 1127 (S.D.Ind.1999).

b. *Hazardous Substance v. Hazardous Waste*

An alternative, case-law developed "recycling" exemption concentrates on the definition of "waste." Although Section 9607(a)(3) only refers to "hazardous substances," the Ninth Circuit has interpreted "hazardous substance" and "hazardous waste" interchangeably "because in the context of CERCLA, hazardous substances are generally dealt with at the point when they are about to, or have become, wastes," *3550 Stevens Creek Assocs. v. Barclays Bank of California,* 915 F.2d 1355, 1362 (9th Cir.1990). The idea of interchangeability was introduced in "Injuries And Damages From Hazardous Waste–Analysis And Improvement of Legal Remedies: A Report to Congress in Compliance With Section 301(e) of [CERCLA]," Part 1, p. 26, issued by the Superfund Section 301(e) Study Group, *id.,* a document accorded substantial weight by other federal courts," *id.* at 1362 n. 14 (citing *Covalt v. Carey Canada, Inc.,* 860 F.2d 1434, 1437 (7th Cir.1988), and *Electric Power Bd. of Chattanooga v. Westinghouse Elec. Corp.,* 716 F.Supp. 1069, 1080 & n. 3 (E.D.Tenn.1988)).

Once "hazardous waste" and "hazardous substance" are deemed equivalent, all of

---

**9.** A second approach considers intent: "whether the defendant intended to dispose of a substance at the time of the transaction." *South Florida Water Management,* 84 F.3d at 406 (citing *Amcast Indus. Corp. v. Detrex Corp.,* 2 F.3d 746, 751 (7th Cir.1993) (when a shipper "is not trying to arrange for the disposal of hazardous wastes, but is arranging for the delivery of a useful product, [s]/he is not a responsible person within the meaning of the statute"); *United States v. Cello–Foil Prods., Inc.,* 848 F.Supp. 1352, 1358 (W.D.Mich.1994) (since the purpose of the defendants' returning drums with residual amounts of hazardous substances was to recover the deposits paid on the drums, the defendants were not liable as "arrangers" who disposed of hazardous materials), *rev'd,* 100 F.3d 1227, 1233–34 (6th Cir.1996) (summary judgment improper based on factual

dispute whether the parties returned the drums with the purpose of disposal of unused solvents); *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 685 F.Supp. 651, 654–56 (N.D.Ill.1988) (Section 9607(a)(3) "attaches only to parties who transact in a hazardous substance in order to dispose of or treat the substance"), *aff'd,* 861 F.2d 155 (7th Cir. 1988).

Another approach "looks to whether a defendant made the 'crucial decision' to place hazardous substances in the hands of a particular facility." *South Florida Water Management,* 84 F.3d at 407 (citing *A & F,* 582 F.Supp. at 845 (the relevant inquiry "ends with that party who both owned the hazardous waste and made the crucial decision how it would be disposed of or treated, and by whom")).

the regulations applying to hazardous waste can be applied to hazardous substances. "Hazardous waste" is given the same meaning in CERCLA as it has in the Solid Waste Disposal Act ("SWDA"), *see* 42 U.S.C. § 9601(29), which defines it as:

a *solid waste*, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed

*Id.* at § 6903(5) (emphasis added).

In 1985, United States Environmental Protection Agency ("EPA") issued "solid waste" regulations, which "explain that certain materials to be *recycled* are not solid waste." *See Catellus Development Corp. v. United States*, 34 F.3d 748, 752 (9th Cir.1994) (citing 40 C.F.R. § 261.2) (emphasis added); *see also United States v. ILCO, Inc.*, 996 F.2d 1126, 1131 (11th Cir.1993) (applying RCRA[10] regulations to batteries in a non-CERCLA case); *United States v. Poly–Carb, Inc.*, 951 F.Supp. 1518, 1527 (D.Nev.1996) (applying *Catellus* to petroleum).

(1) Materials are not solid wastes when they can be shown to be recycled by being:

(i) Used or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed; or

(ii) Used or reused as effective substitutes for commercial products; or

(iii) Returned to the original process from which they are generated, without first being reclaimed or land disposed. The material must be returned as a substitute for feedstock materials. In cases where the original process to which the material is returned is a secondary process, the materials must be managed such that there is no placement on the land. In cases where the materials are generated and reclaimed within the primary mineral processing industry, the conditions of the exclusion found at § 261.4(a)(17) apply rather than this paragraph.

(2) The following materials are solid wastes, even if the recycling involves use, reuse, or return to the original process (described in paragraphs (e)(1)(i)-(iii) of this section):

(i) Materials used in a manner constituting disposal, or used to produce products that are applied to the land; or

(ii) Materials burned for energy recovery, used to produce a fuel, or contained in fuels; or

(iii) Materials accumulated speculatively; or

(iv) Materials listed in paragraphs (d)(1) and (d)(2) of this section.

40 C.F.R. § 261.2(e). Other recycled materials can be considered "solid wastes" if they are treated as provided in paragraphs (c)(1) through (c)(4) of the regulations. *See* 40 C.F.R. § 261.2(c). These regulations are evidence that the EPA, the Agency vested with the discretion to implement CERCLA, gave historical consideration to exempting recycling transactions under other environmental protection statutes.

This approach was applied in *Catellus.* There, General Automotive, operator of Grand Auto Parts Stores, received used car batteries from customers as trade-ins, and sold them to a battery cracking plant, which assumed full and complete ownership and control of the batteries. The plant extracted and smelted the lead, washed and crushed the casings, and trucked them to and dumped them at Catellus' property, where lead from the cas-

---

**10.** Resource Conservation and Recovery Act,  42 U.S.C. §§ 6901, *et seq.*

ings contaminated the property. Catellus sought to recover CERCLA response costs from General. The district court granted summary judgment for General. On appeal, General argued the spent batteries were not "waste" because they were being recycled and the lead extracted to put to further productive use. The Ninth Circuit used the SWDA regulations to find, "General's spent batteries would clearly be defined as waste," *id.* at 752, because the recycling exemption does not apply to "reclaimed materials," *see id.* (citing 40 C.F.R. § 261.2(e) (1993)). A material is reclaimed "if it is processed to recover a useable product, or if it is regenerated." 40 C.F.R. § 261.1(c)(4). The regulations explicitly list "lead values from spent batteries and regeneration of spent solvents" as "reclaimed materials." *Id.* (quoting 40 C.F.R. § 261.2(c)(4) (1993)).

The *Catellus* approach has been expressly disavowed by other courts. The Second Circuit found "Congress and the EPA have carefully distinguished between wastes, to which the Resource Recovery Act applies, and substances, to which CERCLA applies," and held "[t]his statutory and regulatory distinction is a substantial one and should be preserved, absent a clear legislative intent." *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1202 (2d Cir.1992) (recognizing *Eagle-Picher Industries, Inc. v. United States Environmental Protection Agency,* 759 F.2d 922, 927 (1985), *State of Idaho v. Hanna Mining Co.,* 699 F.Supp. 827, 833 (D.Idaho 1987), *aff'd,* 882 F.2d 392 (9th Cir.1989), *United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143, 1147 (D.Az. 1984), and *Transportation Leasing Co. v. California,* 32 E.R.C. 1499, 1501, 1990 WL 300777 (C.D.Cal.1990), also reject the application of these regulations to CERCLA).

The Seventh Circuit highlighted the importance of the useful product and "waste" distinctions:

These distinctions are necessary because otherwise the sale of an automobile would be the disposal of a hazardous substance, since an automobile contains a battery, and a battery contains lead, which is a hazardous substance.

\* \* \* \* \* \*

But at the other extreme is the case of the owner of a facility containing hazardous wastes—perhaps a retaining pond of highly toxic solvents—who wants to get rid of the wastes without liability under CERCLA and to this end sells the facility to a purchaser who does not suspect the presence of the wastes and would not have bought the property had he known of them. This would be the disposal of a hazardous substance by subterfuge, and the seller would be liable to the buyer for clean-up costs under section 107(a)(2). *United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373, 1381 (8th Cir.1989).

In the middle would be a mixed-motives case, where the seller's goal was both to get rid of wastes and to make a bona fide sale of commercially valuable property.

*G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d 379, 384 (7th Cir.1995).

Regardless of the theory utilized to exclude a recycler's liability; *i.e.,* whether dealing in or transporting a useful product or treating recyclable material as not hazardous waste, the pre-Section 127 case law addressing recycler liability is conflicting and the analysis, case-specific and fact-intensive. The pre-existing law concerning recycler CERCLA liability was uncertain and in conflict. "[T]he existence of a controversy regarding the proper interpretation of a statute prior to its amendment rebuts the presumption that an amendment is substantive in nature." *See Plyler v. Moore,* 129 F.3d 728, 736 (4th Cir.1997) (citing 1A NORMAN J. SINGER, STATUTES & STATUTORY CONSTRUCTION § 22.31 (5th ed.1991)). CERCLA Sections 9607(a)(3) and (a)(4) were ambiguous as applied to recycling transactions, corroborating a finding that congressional intent behind

Section 127 is to clarify that recycling is not disposal and shipping for recycling is not arranging for disposal, to achieve the statutory purpose of maintaining a successful, nationwide recycling effort. *See* 145 Cong. Rec. S13087.

### 4. *Is Section 127 a clarification?*

#### a. *Sellers*

Sellers support their pre-Section 127 recycler inconsistency theory by comparing *Cooper Indus. Inc. v. Agway, Inc.*, 987 F.Supp. 92, 108 (N.D.N.Y.1997) [*Cooper II*] and *Pneumo*, 142 F.3d at 775, with *Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1138 (N.D.Fla.1994). Each case addressed a different "hazardous waste: *Cooper II*—scrap steel, *Pneumo*—'slag,'" and *Chatham Steel*—lead.

*Cooper II* recognized a "so-called recycling exemption" and differentiated it from the useful products defense. Ultimately, the defendant was held liable under § 9604, even though the scrap steel it produced was eventually recycled, because the defendant was "getting rid" of the steel, not intending to recycle it. *See Cooper II*, 987 F.Supp. at 108.

In *Pneumo*, the EPA sought to hold parties liable for disposal of hazardous substances, who contracted with a metal foundry to return used metal journal bearings.[11] The Fourth Circuit found no liability after reviewing multiple factors, combining several liability tests, and discerning the intent of both the metal foundry and its customers was the reuse of the metals, not disposal.

Contrary to Sellers's suggestion, *Pneumo* and *Cooper II* are not necessarily consistent. *Cooper II* cites with approval the Ninth Circuit's "exemption" analysis. The Fourth Circuit did not address the district court's statements that directly contradict the Ninth Circuit approach:

[Under such] statutory interpretation, there would exist no plausible reason to use the term "hazardous substance" in § 107 of CERCLA when Congress already had defined the term "hazardous waste" in the SWDA and opted to import several definitions from the SWDA into CERCLA.

If the court were to accept defendant's definition of "disposal", however, there could be no "disposal of a hazardous substance" since the definition of "disposal" would be at odds with the definition of "hazardous substances". Sections of the CERCLA statute regarding the disposal of hazardous substances, therefore, would have to be either ignored or read to mean only disposal of hazardous wastes.

*Pneumo*, 921 F.Supp. 336, 345 (E.D.Va. 1996) (quoting *California v. Summer Del Caribe, Inc.*, 821 F.Supp. 574, 579 (N.D.Cal.1993)), *rev'd, Pneumo*, 142 F.3d at 769.

*Chatham Steel* is a battery case. The defendants sold spent batteries to a company that recovered the valuable components from the batteries, and were sued as PRPs when the company's property was found to be contaminated. The court declined to impose an "intent to dispose" requirement, but recognized that several courts imposed "arranger" liability only when a defendant intended to dispose of or treat a hazardous substance in a transaction. It found these courts' reasoning "ignores the 'strict' liability nature of CERCLA liability;" "lack of knowledge or intent should not serve as a defense to liability under CERCLA." *Id.* at 1139 (citing *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir.1993), *United States v. Cello–Foil Products, Inc.*, 1994 Hazardous Waste Litig. Rep. 26287, 26289–91 (W.D.Mich. March 17, 1994), and *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651, 654–56 (N.D.Ill.1988), *aff'd*, 861 F.2d 155 (7th Cir.1988)).

---

**11.** Journal bearings are rail car parts consisting of "a lead lining ('babbit') and a bronze or brass 'back.'" *Pneumo*, 142 F.3d at 772 (footnote omitted).

"[C]ourts elsewhere have distinguished between the sale or exchange of a 'useful' product versus a 'waste' product.'" *Id.* at 1140 (citing *AM International v. International Forging Equipment Corp.*, 982 F.2d 989, 999 (6th Cir.1993), *Chesapeake and Potomac Tel. Co. v. Peck Iron & Metal*, 814 F.Supp. 1269 (E.D.Va.1992), *United States v. Pesses*, 794 F.Supp. 151, 156 (W.D.Pa.1992), and *Prudential Ins. Co. v. United States Gypsum*, 711 F.Supp. 1244, 1254 (D.N.J.1989)). *Chatham* focused on whether the batteries were useable for the purpose for which they were created. Since the batteries could not supply electric current, defendants were not "dealing in a useful product, but essentially traffick[ed] in a hazardous substance."

Sellers' clarification argument implies there will be no change in the case outcomes under Section 127. *Cooper II*, *Pneumo*, and *Chatham Steel* would all come out the same.[12] If no change results, why was the 127 amendment necessary? As Amicus suggests, some case outcomes will change under the new scheme, facilitating Congress' intent to effect clarity and consistency in recycling decisions.

### b. *The Amicus*

The Amicus agrees CERCLA's ambiguous liability scheme has produced different outcomes on the question, whether the sale of recyclable materials is an "arrangement" for disposal. It compares *RSR Corp. v. Avanti Development, Inc.*, 69 F.Supp.2d 1119 (S.D.Ind.1999), *Douglas County, Nebraska v. Gould, Inc.*, 871 F.Supp. 1242 (D.Neb.1994), and *Pneumo Abex*, 142 F.3d 769 (4th Cir.1998), with *Catellus Development Corp. v. United States*, 34 F.3d 748 (9th Cir.1994), and *Gould, Inc. v. A & M Battery and Tire Serv.*, 933 F.Supp. 431 (M.D.Pa.1996).

In *RSR*, the defendant received used batteries, broke them open to salvage lead, and sold the lead to a smelter. The smelter's site was contaminated by the lead. The smelter sought contribution. The district court found the lead plates were "useful products," and the defendant not liable for such activity, which was a "bona fide business transaction involving a useful product," not "an arrangement for the disposal or treatment of lead plates." *Id.* at 1127. *Douglas County, Catellus,* and *A & M* also are battery cases. In *Douglas County,* the county purchased property in Nebraska, which had been a secondary lead smelting and battery recycling facility. It discovered site contamination and sued prior owners and a number of "waste generators" for contribution, including a company that extracted lead plates from batteries, and sold the plates to the smelter. The court agreed with *Catellus* that a seller "getting rid of a product which has no use except to reclaim the lead inside" should be liable as an arranger for disposal, 871 F.Supp. at 1247, but it characterized the transaction differently: "a reclaimer and seller of lead plates creates a new and useful product which may be incorporated into the buyer's manufacturing process without imposing liability on the seller as an arrangement for its disposal." *Id.*

In *A & M,* the defendants argued that "only the disposal or treatment of 'solid waste' triggers liability, and that batteries are not solid waste." The court disagreed because § 107(a)(3) refers to hazardous substances, not just "solid waste." Lead was determined to be a hazardous substance, and all defendants who sent junk batteries to the site were liable. *See A & M,* 933 F.Supp. at 436. *A & M* cites *Catellus:* "The test for successfully asserting what has become known as the 'useful product' defense is whether the commodity

---

**12.** The *Cooper II* defendant would not qualify for the exemption because there was no evidence the defendant knew the scrap steel would ultimately be reused. The *Pneumo* defendants would be exempt because they likely could satisfy all Section 127 criteria. The *Chatham Steel* defendant would not qualify for the exemption because it recovered the valuable components from the batteries.

being sold will continue to be used for its originally intended purpose." *Id.* at 436. *A & M* found the sale of junk batteries to a battery recycling facility, which would not be used for their original purpose, is an arrangement for disposal or treatment of a hazardous substance. On the *A & M* facts, the *Douglas* court would have reached the same conclusion.

Under the 127 exemption scheme, *RSR* and *Douglas County* come out differently because valuable components of the batteries were recovered. Defendants in *A & M* and *Catellus* did not recover valuable components of the batteries. The exemption applies and the outcomes change. Senator Lott's remarks are directed at *A & M* and *Catellus* type transactions. *See* 145 Cong. Rec. S13086 ("We had one and only one purpose in introducing the Superfund Recycling Equity Act-to remove from the liability loop those who collect and ship recyclables to a third party site.").

Prior cases have unintendedly found recyclers liable, based on subjective definitions of recycling and conflicting approaches. Judicial development of a "so-called recycling exemption" has focused on the nature of the material and the activities to which it will be subjected. *Stevens Creek, Catellus* and their progeny looked to the EPA's administrative definition of "recycling," while other courts use the "useful product" rationale. Yet other courts used non-disposal and nonhazardous materials doctrines; a knowledge and/or intent-based analysis; and/or a strict liability approach, all of which has produced conflict, ambiguity, and uncertainty in recycling cases. What these pre–127 cases do reveal is that courts have struggled to recognize and apply a recycling exemption to CERCLA liability.

Congress, in Section 127, creates an express definition for "recycler" and explicit rules for what transactions and activities constitute "recycling." It defines "recyclable material" based on types of product, use, and intended purpose. The statute encourages recyclers' environmental responsibility in conducting business. For materials not listed in Section 127, the pre–127 analysis is explicitly left intact. The statute is rationally designed to achieve clarification and consistency in addressing recycler liability under CERCLA to serve the ultimate purpose of protecting the recycling industry and encouraging recycling.

Plaintiff cautions, assuming, arguendo, Congress enacted Section 127 to bring clarifying certainty to CERCLA recycler liability, *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), distinguishes legislative override of a judicial decision from retroactivity: "Because retroactivity raises special policy concerns, the choice to enact a statute that responds to a judicial decision is quite distinct from the choice to make the responding statute retroactive." *Id.* at 305, 114 S.Ct. 1510; *see also United States v. Collins,* 118 F.3d 1394, 1398 (9th Cir. 1997) (quoting from *Rivers:* "[a] legislative response does not necessarily indicate that Congress viewed the judicial decision as 'wrongly decided' "). The analysis of the pre–127 recycling case law leads to the conclusion that Congress' decision was not so much to change judicial decisions governing recyclers, as most of the factors used by courts in pre–127 cases are incorporated by the statute; but, rather, to clarify the criteria for and approach to liability.

From the totality of the circumstances underlying Section 127's passage, particularly the conflict and lack of consistency in the case law, the most reasonable interpretation from the statute's language, context, and legislative history is that Congress meant to clarify not change, eliminate ambiguity and conflict, and bring uniformity and certainty to recycler liability under CERCLA.

## D. LEGISLATIVE HISTORY RE CLARIFICATION v. CHANGE

Sellers and Amicus refer to Section 127's legislative history to support their conten-

tion it is a clarification of CERCLA. Senator Lincoln remarked:

> Recognizing that this issue has been the focus of much litigation, the Congress *intended that the recycling situation be clarified* through the Superfund Recycling Equity Act. That is why we have written this legislation in such a fashion that *virtually all lawsuits that deal with recycling transactions of paper, glass, plastic, metals, textiles, and rubber are extinguished by this legislation.* Only those lawsuits brought prior to enactment of this legislation directly by the United States government against a person will remain viable. All other lawsuits brought by private parties, or against third party defendants in lawsuits originally brought by the U.S. Government will no longer proceed under this legislation. This will resolve the inequities suffered by recyclers in a quick, fair, and equitable manner.

145 Cong. Rec. S15028 (emphasis added). Senator Lott stated:

> While the bill proposed to amend Superfund, Mr. President, it is really a recycling bill. Recycling is not disposal and shipping for recycling is not arranging for disposal-it is a relatively simple *clarification,* but one that is necessary to maintain a successful recycling effort nationwide.

145 Cong. Rec. S13086 (emphasis added).

No sponsor or non-sponsor stated that Section 127 is not a clarification. Senator Daschle nowhere suggests Congress intended to change the substantive law for recycler liability. On balance, the legislative history strongly supports the finding Section 127 is a clarification of recycler liability under CERCLA.

## VII. *DOES 127's LANGUAGE INCLUDE THE STATE OF CALIFORNIA?*

Plaintiff's alternative argument is that Section 127(i)'s use of the term "United States:" should be read to include any enforcement action brought by the States.

DTSC contends: "[T]hroughout CERCLA, Congress has expressed an intention to place primary responsibility for cleanup of hazardous waste sites on a partnership between the States and the Federal Government." Under 40 C.F.R. § 300.5, a State or political subdivision of a state may be a "lead agency" for a CERCLA response action if "operating pursuant to a contract or cooperative agreement executed pursuant to section 104(d)(1) of CERCLA, or designated pursuant to a Superfund Memorandum of Agreement (SMOA) entered into pursuant to subpart F of the NCP or other agreements." 40 C.F.R. § 300.5. Section 104(d)(1) provides:

> A State or political subdivision thereof or Indian tribe may apply to the President to carry out actions authorized in this section. If the President determines that the State or political subdivision or Indian tribe has the capability to carry out any or all of such actions in accordance with the criteria and priorities established pursuant to section 9605(a)(8) of this title and to carry out related enforcement actions, the President may enter into a contract or cooperative agreement with the State or political subdivision or Indian tribe to carry out such actions. The President shall make a determination regarding such an application within 90 days after the President receives the application.

42 U.S.C. § 9604(d)(1). A state and the United States are not functionally equivalent under § 104(d)(1). *See Orange Environment, Inc. v. County of Orange,* 860 F.Supp. 1003, 1025–28 (S.D.N.Y.1994); *see also Acme Printing Ink Company v. Menard, Inc.,* 870 F.Supp. 1465, 1475 (E.D.Wis.1994).

DTSC does not contend that it has been federally authorized under CERCLA Section 104 to prosecute this enforcement action. Nor does it identify any "other" type of agreement referenced in the Code of Federal Regulations that would give it equal status with the United States for CERCLA enforcement purposes. This is

not a federal-state partnership case. No federal-state enforcement partnership to effectuate CERCLA can exist in this case, because DTSC has sued the United States, as a PRP, seeking ·cost recovery, claiming the United States arranged for disposal of or transportation for disposal of hazardous substances.

Plaintiff also argues Senator Lott's legislative history supports its position. *See* Br. at 20:7–13. Specifically:

> Any pending judicial action, whether it was brought in a trial or appellate court, *by a private party* shall be subject to the grant of relief from liability. For the purposes of this section, Congress intends that any third party action or joinder of defendants brought by a private party shall be considered a private party action, regardless of whether or not the original lawsuit was brought by the United States. Additionally, any administrative action brought by any governmental agency but not yet concluded as set forth above, shall be subject to the grant of relief from liability set forth in this § 127.

S15050 (emphasis added). Plaintiff contends "[t]his language suggests that Section 127 was focused on the distinction between government enforcement actions and private party actions." It is true that a state agency that pursues a CERCLA cost-recovery action at taxpayer expense, using public resources, to investigate and remediate a CERCLA site is more like the United States than a private party. However, Senator Lott's statement explicitly mentions "administrative actions brought by *any* governmental agency." This includes state agencies. As Amicus points out, Congress knows how to refer to a State in CERCLA, when Congress so intends.[13] *See, e.g.,* CERCLA §§ 103(c), 104(b)-(e), 106(a), 107(a), (d), (f), and (j)-(*l*), 110, 111(f), 113(f), 114(a), 117(a), 120(f). It did not do so in 127(i)'s exceptions to retrospectivity.

A court should not imply a specific term Congress included in one section of a statute, but excludes from another section of the same statute. *See Cramer v. C.I.R. Serv.,* 64 F.3d 1406, 1412 (9th Cir.1995). Congress did not mention pending judicial actions brought by a state agency anywhere in the Act. If Congress intended a pending action exception to retrospective application for any State or state agency in 127(i), all it had to do was say so by including the term "any State or state agency." Its choice not to include States within the exception for pending judicial actions brought by the United States is clear evidence that Congress did not intend the exception to 127's recycler exemption to apply to pending State- or state agency-initiated actions. Summary adjudication on the issue of retrospectivity of Section 127 is appropriate.

## VII. *CONCLUSION*

■ Congress knows that to make a statute retrospective, it must use an express command or an unambiguous directive to promulgate such a temporal application. In enacting 127, it *did not* mention every class of pending case to which the Recycling Act applies. Despite the omission to specifically mention pending judicial CERCLA actions initiated by a State, the express language, structure, purpose, and legislative history of Section 127 militate in favor of retrospectivity, as to all pending actions brought by any party, including the State or state agencies, except the United States, subject to 127(i)'s three exceptions. This effects no dispositive result for or against any party. Rather, any party seeking to avoid liability under the 127 recycler's exemption still must prove by a preponderance of the evidence all the requirements of that law are satisfied.

The Act is not retroactive in its effect. Analysis of the prior case law reveals the

---

**13.** *See, e.g.,* 42 U.S.C. § 9607(a) (addressing "the United States Government or a State"); (f) (same); (i) (same); 42 U.S.C. § 6913(f) (same).

liability outcome for each alleged recycler should not be different. Significantly, Plaintiff does not contend that any party qualifying for the recycler's exemption would have been liable under the prior law. No state "right" has been curtailed. Plaintiff does not suffer increased liability nor are new duties imposed on it with respect to a completed transaction. DTSC identifies no expectations it relied on to its detriment that have been upset. DTSC does not contend it would have acted any differently if the recycler's exemption had existed when it commenced its efforts at the site. There is no manifest injustice in applying Section 127 to all transactions and claims in this case. Plaintiff's motion for summary judgment is DENIED. Summary adjudication is GRANTED. Section 127, the recycler's exemption applies to all parties and all transactions in this pending action brought by the California DTSC.

SO ORDERED.